THOMSON, TRUSTEE OF THE PROPERTY OF THE CHICAGO & NORTH WESTERN RAILWAY CO., *v.* UNITED STATES ET AL.

No. 70. Argued December 7, 1943.—Decided January 17, 1944.

*Mr. Nye F. Morehouse,* with whom *Messrs. William T. Faricy* and *P. F. Gault* were on the brief, for appellant.

*Mr. Robert L. Pierce,* with whom *Solicitor General Fahy, Assistant Attorney General Berge,* and *Messrs. Edward Dumbauld, Walter J. Cummings, Jr., Daniel W. Knowlton,* and *Allen Crenshaw* were on the brief, for appellees.

MR. JUSTICE MURPHY delivered the opinion of the Court.

This direct appeal from a statutory three-judge district court involves important problems relating to "grandfather" rights to a certificate as a common carrier by motor vehicle in a single coordinated rail-motor freight service. The final decree of that court dismissed appellant's petition to set aside an order of the Interstate Commerce Commission, 31 M. C. C. 299. The Commission's order had denied to the Chicago and North Western Railway Company, of which appellant is trustee, a certificate of public convenience and necessity as a common carrier by motor vehicle under the so-called "grandfather clause" of § 206 (a) of Part II of the Interstate Commerce Act, 49 U. S. C. § 306 (a).

The essential facts are clear. The Chicago and North Western Railway Company, hereinafter referred to as the railroad, has extensive mileage in nine western states and is a large carrier of freight in less than carload lots. Prior to and since the statutory "grandfather" date of June 1, 1935, it has supplemented its rail freight service by providing motor vehicle service between various freight stations on its rail lines. There are twenty-three such motor vehicle routes on highways parallel with and roughly adjacent to the railroad's lines. The motor trucks transport less than carload lots of freight in complete co-ordination with the rail service. The railroad instituted

this additional method of transportation in order to furnish an improved and more convenient freight service to the public in certain areas of light traffic and in order to curtail car mileage and way-freight service. Motor vehicle transportation, in other words, is merely a new method of carrying on part of its all-rail freight business in which it had been engaged for many years.

The railroad has consistently held itself out to the general public and to shippers as being engaged in this coordinated rail-motor freight service. It solicits all the freight transported by the trucks operating as part of this unified service and its bills of lading and tariffs are used throughout. The shipper does not know in a specific instance whether his freight will be shipped entirely by rail or partly by motor vehicle. But he is informed by the railroad's tariffs that the railroad at its option may substitute motor vehicle service for rail service between stations on its lines and that the charges in such a case are the same as would be applicable for all-rail service.

In so substituting motor vehicle service, the railroad has not deemed it advisable to purchase or lease motor trucks or employ its own personnel in such operations. Instead it has entered into written contracts for this service with motor vehicle operators who also serve customers other than the railroad. But the railroad at all times maintains direct and complete control of the movement and handling of its freight by these operators. It fixes the truck schedules so as to coordinate them with the rail schedules and designates the amount and particular shipments of freight to be moved. The motor vehicle operators issue no billing of any kind and solicit none of the freight transported for the railroad. They have no contractual or other relationships with either the shippers or the receivers of the freight. Their trucks are loaded at the freight stations by railroad employees, sometimes assisted by the truck drivers. After a truck is loaded a manifest

is issued by the railroad's agent, which is signed by the truck driver; upon delivery of the freight to the other railroad freight station the manifest is signed by another railroad agent, thus releasing the motor vehicle operator.

The written contracts describe the operators as "independent contractors" and state that "nothing herein contained shall be construed as inconsistent with that status." The contractors are bound by these contracts to provide vehicles of a type satisfactory to the railroad for the purpose of transporting freight between certain specified freight stations in accordance with such schedules and instructions as shall be given by the railroad. The contractors agree to transport such freight as the railroad designates in a manner satisfactory to the railroad. All persons operating the motor vehicles are under the employment and direction of the contractors and are not considered railroad employees. The operations are conducted under the contractors' own names and the vehicles do not display the railroad's name. The contractors further agree to comply with state, federal and municipal laws and to indemnify the railroad against any failure or default in this respect. They also agree to indemnify the railroad against all loss or damage of any kind resulting from the operation of the motor vehicles. The railroad is authorized to maintain for its own protection public liability and property damage insurance on all the vehicles at the contractors' expense up to a specified amount. Finally, the contracts provide that in the event that the highways between any of the stations become impassable the contractors shall immediately notify the railroad so that it can arrange and substitute other service if it desires.

With respect to these operations, the Commission found that the railroad did not operate motor vehicles "either as owner or under lease or any other equivalent arrangement." The contract provisions were found to "establish

that the motor vehicles are to be supplied by the contractors and operated under their direction and control and under their responsibility to the general public as well as to the shippers. It is clear, therefore, that the motor-vehicle operations have been and are those of others as common carriers by motor vehicle in their own right and not those of applicant." The Commission accordingly denied the railroad's "grandfather" application. The district court dismissed without opinion the railroad's suit to set aside and enjoin the Commission's order, after finding that the order was lawful and was supported by substantial evidence.

In light of these undisputed facts, however, we hold that the Commission erred in finding that the railroad was not entitled to a certificate as a common carrier by motor vehicle. This error arises not from a lack of substantial evidence to support its conclusion or from an improper exercise of its discretion. Rather it is due to an incorrect application to these facts of the statutory provisions and Congressional intention relating to "grandfather" rights of common carriers by motor vehicle.

Under the "grandfather" clause of § 206 (a) of Part II of the Interstate Commerce Act, a certificate of public convenience and necessity can be awarded only to one who is a "common carrier by motor vehicle" within the meaning of the Act. Originally the term "common carrier by motor vehicle" was defined to include any person who undertakes, "whether directly or by a lease or any other arrangement," to transport passengers or property for the general public by motor vehicle.[1] For purposes of clarity, however, this language was stricken and the term was redefined by Congress in 1940 to include any person "which holds itself out to the general public to engage

---

[1] § 203 (a) (14) of the Motor Carrier Act of 1935, 49 Stat. 543, 544.

in the transportation by motor vehicle" of passengers or property.[2]

In addition, as we pointed out in *United States* v. *Rosenblum Truck Lines,* 315 U. S. 50, 53, 54, "We think it clear that Congress did not intend to grant multiple 'grandfather' rights on the basis of a single transportation service." Thus where a person holds himself out to the general public to engage in a single transportation service, consisting entirely or partly of motor vehicle operations, he is a "common carrier by motor vehicle" within the contemplation of the statute. And Congress intended that he alone should receive "grandfather" rights on the basis of that single service under § 206 (a) of the Act.

The undisputed facts here disclose that only the railroad holds itself out to the general public to engage in a single complete freight transportation service to and from all points on its lines. As an integral and essential part of this service tendered by the railroad, motor vehicle transportation between certain stations is provided. It is completely synchronized with the rail service and has none of the elements of an independent service offered on behalf of the motor vehicle operators. Their operations are the operations offered by the railroad as component parts, not as separate or distinct segments, of its single service. They may be replaced or eliminated at the sole discretion of the railroad.

The railroad, furthermore, is actively engaged in providing this single coordinated service. As to the motor vehicle operations supplementing its rail service, it is not a mere freight broker or forwarder. Cf. *Acme Fast Freight* v. *United States,* 30 F. Supp. 968, affirmed 309

---

[2] § 203 (a) (14) as amended by the Transportation Act of 1940, 54 Stat. 898, 920. No change in the legislative intent with respect to the definition of common carriers by motor vehicle of the type involved in this case was evidenced by this amendment. See 86 Cong. Rec. 11546.

U. S. 638; *O'Malley* v. *United States,* 38 F. Supp. 1; *Moore* v. *United States,* 41 F. Supp. 786, affirmed 316 U. S. 642. Nor can it be described as the consignor or consignee of the freight so transported by motor vehicle. Cf. *Lehigh Valley R. Co.* v. *United States,* 243 U. S. 444. The provisions and actual operation of the contracts with the operators demonstrate the railroad's rigid control over the movement of the freight and its retention of full responsibility to the shippers. The operators are "independent" only by grace of contract nomenclature. By any realistic test they are mere aids in carrying out a part of the railroad's coordinated rail-motor freight service.

Thus the railroad clearly is undertaking to transport freight by an "other arrangement," as those words are used in the original statutory definition of "common carrier by motor vehicle." Cf. Chairman Eastman's concurring opinion in Missouri Pacific R. Co. Common Carrier Application, 22 M. C. C. 321, 333. Even more clearly, under the amended definition, the railroad is holding itself out to the general public to engage in the transportation of freight by motor vehicle as part of its coordinated rail-motor freight service. In short, it is a common carrier by motor vehicle within the meaning of the Act. And the application of the Congressional intention not to grant multiple "grandfather" rights in such a situation becomes clear. The railroad alone is entitled to common carrier "grandfather" rights as to the motor vehicle service forming an integral part of its unified freight service. Any other conclusion would authorize the wholesale granting of twenty-three "grandfather" permits to the various motor vehicle operators on the basis of this single transportation service offered by the railroad—a result which ascribes to Congress "an intent incompatible with its purpose of regulation." *United States* v. *Rosenblum Truck Lines, supra,* 54. We need not decide whether these operators are entitled to "grandfather" permits as

to other freight transported over their routes. But only the railroad acquired "grandfather" rights as to the freight which they transport as an integral part of the railroad's coordinated rail-motor service.

The Commission has taken the view that only one certificate can be granted on the basis of a single transportation service and that the "common carrier by motor vehicle" entitled to the certificate is the one who exercises direction and control of the motor vehicle operations and assumes full responsibility therefor both to shippers and the general public. This so-called "control and responsibility" test, however, is applicable in this case only insofar as it aids in determining the person offering and engaging in the single coordinated rail-motor freight service. To the extent that it leads to a result different from that reached by the application of the statutory provisions and the Congressional intent which we have indicated, it must be disapproved.

The judgment of the court below is reversed. The case is remanded to that court with directions to remand it to the Commission for such further proceedings, consistent with this opinion, as may be appropriate.

.                                                  *Reversed.*

Mr. Justice Jackson is of the opinion that the judgment should be affirmed.

Mr. Justice Douglas, with whom Mr. Justice Black concurs, dissenting:

One who arranges for another to do some hauling for him may or may not enter the hauling business. The question whether the one or the other is the entrepreneur has occupied the courts from an early day. Holmes, Agency (1891), 5 Harv. L. Rev. 1, 15–16. The Commission has drawn upon that body of law concerning independent contractors for the purpose of determining

whether in case of line-haul transportation the carrier dealing directly with the shipper or the one performing the actual motor transportation was the common carrier entitled to grandfather rights under the Act. That is to say it has held, and consistently so, that the carrier which exercised direction and control of the actual motor-vehicle operations and assumed responsibility therefor to shippers and to the general public was the one who was in "operation" during the specified period as a "common carrier by motor vehicle" within the meaning of the grandfather clause. § 206 (a). That test has been applied whether the carrier dealing directly with the shippers was a common carrier by motor vehicle (Dixie Ohio Express Co., 17 M. C. C. 735, 738–741; J. T. O'Malley, 23 M. C. C. 276, 279) or a common carrier by rail. Willett Company of Indiana, Inc., 21 M. C. C. 405, 408; Missouri Pacific R. Co., 22 M. C. C. 321, 326–327. It has been applied after as well as before the 1940 amendment.[1] Boston & Maine Transportation Co., 30 M. C. C. 697, 704–705. And in applying the test to railroad applicants it has placed them on a parity with motor vehicle applicants. Boston & Maine Transportation Co., *supra*. And see Crooks Terminal Warehouse, 34 M. C. C. 679. There have been disagreements within the Commission whether particular applicants satisfy the test. Missouri Pacific R. Co., *supra;* Boston & Maine Transportation Co., *supra.* But there has been no disagreement over the propriety of the control and responsibility test itself.

The control and responsibility test provides a fair measure of the grandfather rights. He who shows that he has been and is an independent contractor has established his claim to the transportation business as clearly as any connecting carrier. The fact that the transportation service offered is closely integrated and held out to the public

---

[1] See note 2, *infra.*

as such does not mean that segments of the line-haul operation may not comprise separate enterprises. To attach grandfather rights to the separate segments is not to grant multiple rights. It is to allow those rights to follow ownership of the enterprise. I see no other way to effectuate the Congressional policy of preserving through the grandfather clause the position which motor vehicle operators "struggled to obtain in our national transportation system." *United States* v. *Carolina Freight Carriers Corp.,* 315 U. S. 475, 488. To conclude that the present arrangement is a mere agency is to disagree with the Commission in its application of the control and responsibility test. To rest grandfather rights on the integrated rail-motor service which appellant offers the public is to grant it rights based on another man's business. To grant appellant these grandfather rights on the basis of a holding out is to give to the 1940 amendment an effect which Congress concededly did not intend.[2] I do not believe that

---

[2] Prior to 1940 the Act defined "common carrier by motor vehicle" as one who "undertakes, whether directly or by a lease or any other arrangement, to transport passengers or property," etc. § 203 (a) (14). The Transportation Act of 1940 amended that definition. It provided, so far as material here, that a "common carrier by motor vehicle" was "any person which holds itself out to the general public to engage in the transportation by motor vehicle in interstate or foreign commerce of passengers or property." As the opinion of the Court states, that amendment made no change as respects common carriers of the type involved in this case. It had the "sole purpose of eliminating carriers performing pick-up, delivery, and transfer service." 86 Cong. Rec. 11546. And see Boston & Maine Transportation Co., *supra,* 703–705. The grandfather clause contained in § 206 (a) provides for the issuance of a certificate without proof of public convenience and necessity, if the carrier "was in bona fide operation as a common carrier by motor vehicle on June 1, 1935, over the route or routes or within the territory for which application is made and has so operated since that time."

Thus after as well as before the 1940 amendment the basic question in this type of case was whether the connecting carrier was in

Congress intended to put applicants such as appellant in a preferred position.

Since there is concededly sufficient evidence to support the findings of the Commission on the control and responsibility test, I would affirm the judgment below.

"*bona fide* operation" as such a carrier. If it was an independent contractor it was engaged in such "operation"; if it was performing a transportation service as a mere agent for the carrier with whom the shipper dealt, it was not. Boston & Maine Transportation Co., *supra.*