# STATE v. NORTHERN PACIFIC RAILWAY COMPANY.[1]

April 6, 1944.

Nos. 33,555, 33,630.

[1]Reported in 14 N. W. (2d) 232.

114

*L. B. daPonte* and *M. L. Countryman, Jr.,* for appellant Northern Pacific Railway Company.

*J. A. A. Burnquist,* Attorney General, *P. F. Sherman,* Assistant Attorney General, and *Irving M. Frisch,* Special Assistant Attorney General, for the State.

STREISSGUTH, JUSTICE.

In this suit to recover allegedly delinquent gross earnings taxes for the years 1934, 1935, 1936, and 1937, both parties have appealed from the judgment in favor of the state. They respectively challenge and defend the defendant's failure to report as gross earnings certain recurring items of income to which specific reference will presently be made.

Four of the items involve income which defendant asserts was received from sources other than its transportation business and, therefore, not properly included in its gross earnings. The fundamental principles governing the proper allocation of the items are not in dispute; they have been settled by a series of decisions of this court, none of which is sought to be disturbed. The dispute concerns the application of these principles to the stipulated facts. ▪ State v. M. & I. Ry. Co. 106 Minn. 176, 181, 118 N. W. 679, 680, 1007, 16 Ann Cas. 426, expresses the accepted approach to questions of the character involved, thus:

"The operation of a railroad is not necessarily restricted to operating trains upon railway tracks. We believe it to have been the purpose of the legislature to require railroad companies to pay into the state treasury the stated percentage of the amount of earnings received in connection with all operations reasonably within the powers conferred upon them by the corporate acts. Such companies are organized and conducted primarily for transportation purposes, but they receive a considerable income from other sources incidental to the transportation business, though not directly from

the operation of trains. We believe the proper meaning of the act under consideration to be that, when a railroad company is engaged in work reasonably within its charter powers, the receipts from such sources constitute gross earnings in the operation of the railroad."

With that decision as our "Atlantic Charter," we proceed to a consideration of "four freedoms" from gross earnings taxes which the railroad here proclaims.

### STOCKYARD CHARGES

(a) The St. Paul Union Stockyards Company, a Minnesota corporation, owns and operates public stockyards at South St. Paul, including suitable pens for the unloading by railroad of inbound shipments and the loading of outbound shipments. It performs all common-carrier services for the unloading from railroad cars and loading into railroad cars to and from said pens. Because defendant's line of railroad does not extend to South St. Paul, shipments of ordinary livestock transported over its line and destined for or originating at the stockyards must be handled in switching movements by other railroad companies between defendant's terminals in St. Paul and the stockyards at South St. Paul.

Under 49 USCA, c. 1, § 15(5), (Interstate Commerce Act), transportation wholly by railroad of ordinary livestock in carload lots destined for or received at public stockyards includes delivery of inbound shipments into suitable pens, and receipt and loading of outbound shipments, without extra charge therefor to the shipper, consignee, or owner. The freight rates for such transportation were fixed by the Interstate Commerce Commission in a proceeding known as Livestock—Western District Rates, 176 I. C. C. 1, and were therein declared to be intended to cover the cost of such necessary services as § 15(5) contemplates shall be performed without additional charge.

Prior to 1934, the charges for transportation of ordinary livestock in carload lots between points on defendant's railroad and stockyards consisted of defendant's separately established charges

plus the switching charge of the connecting carrier. During 1933, defendant and other carriers were required to establish through rates without the addition of a switching charge. St. Paul Live Stock Exch. v. C. M. St. P. & P. R. Co. 194 I. C. C. 53. Out of said through rates, defendant has ever since been required to pay over to the carrier performing the switching service between St. Paul and South St. Paul its published switching charge, and to pay over to the stockyards company the amount of the charge contained in schedules filed by it with the secretary of agriculture of the United States for the services performed by the stockyards company in loading and unloading.

The court below held that the amounts so paid to defendant by shippers of livestock and by defendant paid to the stockyards company constituted part of defendant's gross earnings and were taxable as such. In this the court erred.

The fact that defendant is required to extend its published rates to include the switching services of the connecting carrier and the loading and unloading charges of the stockyards company does not militate against the fact that the loading and unloading services at South St. Paul are as separate and distinct from defendant's operations as such services would be if the stockyards were located at Austin or any other point requiring the services of a connecting carrier. Though the services of the connecting carriers between St. Paul and South St. Paul are, in railroad terminology, designated "switching" services, they are not essentially different in character from those of a connecting carrier between St. Paul and Austin in the case we have assumed.

The charges of the stockyards company are published charges subject to regulation by the I. C. C. (Union Stock Yard & Transit Co. v. United States, 308 U. S. 213, 60 S. Ct. 193, 84 L. ed. 198), and through transportation rates are fixed by the I. C. C. to include such charges. The transportation of livestock over defendant's railroad to and from South St. Paul had all the indicia of "through," as opposed to "local," transportation, and the charges in question are for separate and distinct services incident to "through" trans-

portation. No part of the charges were "earnings" of the railroad company within the common meaning of that term; no part represented services rendered by it in its transportation business. The services performed at South St. Paul were those of the stockyards company and not those of the railroad company, and, to the extent that charges are made to the shipper for these services, they represent earnings of the stockyards and not the railroad. In collecting the total charges from the shippers of livestock, defendant was a mere conduit or pipe line for the transmission of the stockyards company's share of the total freight charges from the shippers of livestock to the stockyards company. It acted as mere agent for the stockyards company in these transactions and, therefore, should not be required to include the stockyard charges in its gross earnings returns.

### Pick-Up and Delivery Service

(b) Defendant has never owned or operated any facilities for receiving or delivering any freight at the places of business of shippers or consignees not located on its railroad trackage. About January 20, 1936, to give its patrons better service on less-than-carload (L. C. L.) freight and to meet the growing challenge of "Ship-by-Truck" competition, it joined with other railroads in the publication of a tariff fixing rules, charges, and allowances for "store-door" pick-up and delivery of L. C. L. freight. The plan resulted in the introduction of a new method of carrying on the railroads' merchandise freight transportation business.

"Pick-up Service" is defined in the tariffs as "calling for and collecting freight, and receipting therefor, from a dock, platform, doorway or other facility directly accessible to highway vehicles; and includes transportation therefrom to the premises of the carrier's freight depot." "Delivery Service" is defined as "transporting freight from the premises of the carrier's freight depot, and the delivery thereof to a dock, platform, doorway or other facility directly accessible to highway vehicles."

Under these tariffs, the shipper and the consignee are in most instances entitled to pick-up and delivery service, or, in lieu thereof, to an allowance of five cents per 100 pounds where the pick-up service is not requested and five cents per 100 pounds where the delivery service is not requested. The pick-up and delivery service or the payment of allowances in lieu thereof is not, however, invariably accorded. Charges on the shipment must aggregate at least 20 cents per 100 pounds; if they do not, "an additional charge sufficient to increase the average charge to 20 cents per 100 pounds will be assessed before the Pick-Up and/or Delivery Service will be performed or allowances made."

Where the shipment is entitled to the pick-up and delivery service, it is optional with the shipper either to make use of the service or to require repayment of the allowances in lieu thereof and thereby obtain a reduction of the freight charges. Pick-up service, if desired, must be requested and the fact indicated on the bill of lading or shipping order. Where the shipper or the consignee makes his own arrangements for highway vehicle transportation of the shipment to or from the carrier's freight depot, and so instructs the carrier, he is entitled to the allowance.

When these tariff provisions were published, defendant entered into contracts with numerous persons, firms, and corporations engaged in the public trucking business at stations on its lines, under the uniform terms of which the contractor agreed to transport L. C. L. freight from the depot to the place of business of any consignee in or near his city, and likewise to transport L. C. L. freight from the place of business of the shipper to the freight depot. The contractor agreed to conduct the work as an independent contractor in his own name; to give receipts to shippers and to furnish the railway company with copies; to take receipts in duplicate from consignees for shipments delivered and to receipt to the railway company for all freight taken to the freight house; to assume full responsibility for freight charges collected, except where collection otherwise than in cash was authorized; to indemnify the railway company against loss, damage, cost, or expense from acts or omis-

sions of the contractor or his agents and to assume liability as an insurer of all freight while in his possession; to comply with all laws and workmen's compensation insurance and to indemnify the railway company against any subrogation claims; to comply with all laws, rules, and regulations applicable to the trucking; to assume the expense of insurance; and to accept as full compensation for his services the amounts specified in the contract, based on the waybills of the railway company for the business transacted each month.

The compensation of the contractors stipulated for in these contracts varied from place to place, but averaged 7.57 cents per 100 pounds during the years 1936 and 1937, which was more than the five cents per 100 pounds charged the shipper or the consignee.

Under these stipulated facts, the finding of the trial court that defendant offered and furnished pick-up and delivery service "as an integral part of the transportation of freight over its line of railroad within the state" was inescapable insofar as shippers and consignees actually availed themselves of the proffered service. Under its new plan, merchandise freight was solicited by the railroad from shippers for movement, and was actually moved, in accordance with the rates and provisions set forth in its tariffs. The railroad was responsible at all times to the shipper or the receiver of the freight for safe handling and delivery thereof at the ultimate destination. The freight moved exclusively on railroad billing. The truckers had no contractual arrangements whatever with the shippers or the receivers; it was to the railroad and not to the truckers that the shipper or the receiver looked for performance of the common-carrier service involved. The new service, for all practical purposes, extended the railroad lines, if not its rails, beyond its freight depots and on to "Main Street." L. C. L. freight, under the new plan, was transported in all respects by the railroad as a common carrier in exactly the same manner as it always had been transported, except that the freight, instead of moving all the way in a boxcar, was transported part of the way in a truck and part in a boxcar. The railroad's responsibility as a common car-

rier, however, with respect to the freight so moved never ceased at any time.

The amounts paid in by such shippers or consignees cover carrier services furnished by the railroad, through the truckers, to the shipping public at published tariff rates. The amounts paid to the truckers are not the published tariff charges of five cents per 100 pounds, but any sum the defendant may choose to pay after proper negotiation. The average amount per 100 pounds paid the truckers in fact exceeded the charge made to the shippers and the consignees. Defendant presumably was willing to furnish the service at a loss rather than see much of its L. C. L. business go to public truckers.

Our conclusion is fortified by a uniform line of decisions. Thus, in State v. G. N. Ry. Co. 160 Minn. 515, 200 N. W. 834, the cost of loading and unloading ore and other services performed by a subsidiary dock company was held to be an operating expense and hence not deductible by the parent railroad company from its gross earnings.

So, in State v. M. & St. L. R. Co. 204 Minn. 250, 283 N. W. 244, balances due to other railroads for the use of their equipment was held not deductible.

Finally, in State v. Railway Exp. Agency, Inc. 210 Minn. 556, 299 N. W. 657, amounts paid by a railroad to an express company for pick-up and delivery services comparable to those here involved were held not deductible from its gross earnings, even against the objection that such amounts were also taxable against the railroad company as part of its gross earnings.

The fact that the truckers employed by defendants are independent contractors hauling on their own responsibility is not decisive. The test is not whether defendant performs its services to the public through employes or through contractors, or at a direct gain or loss to itself, but whether the services are performed as an incident of defendant's business as a railroad company. Here, defendant solicited competitive freight business by meeting the offer of its "infant" competitors to pick up and deliver at store doors; it

arranged for and procured truckers to supplement its railroad services, and thereby integrated the railroad and trucking services into a complete whole, which it offered to the public at an attractive rate, at an actual loss to itself on the truck haul. The fact that the device of "independent contractor" was used instead of contracts of employment did not have the effect of divorcing the truck haul from the rail haul. The two were as inextricably bound together as Siamese twins. Defendant's attempt to separate them by its "independent contractor" operation must be pronounced unsuccessful.

What the United States Supreme Court but recently said in respect to a railroad's somewhat similar arrangement designed to furnish truck service for L. C. L. shipments between railway stations is most apt:

"* * * As an integral and essential part of this service tendered by the railroad, motor vehicle transportation between certain stations is provided. It is completely synchronized with the rail service and has none of the elements of an independent service offered on behalf of the motor vehicle operators. Their operations are the operations offered by the railroad as component parts, not as separate or distinct segments, of its single service. They may be replaced or eliminated at the sole discretion of the railroad.

"The railroad, furthermore, is actively engaged in providing this single coördinated service. As to the motor vehicle operations supplementing its rail service, it is not a mere freight broker or forwarder. * * * Nor can it be described as the consignor or consignee of the freight so transported by motor vehicle. * * * The provisions and actual operation of the contracts with the operators demonstrate the railroad's rigid control over the movement of the freight and its retention of full responsibility to the shippers. *The operators are 'independent' only by grace of contract nomenclature. By any realistic test they are mere aids in carrying out a part of the railroad's coördinated rail-motor freight service.*" (Italics supplied.) Thomson v. United States, 321 U. S. 19, 24, 64 S. Ct. 392, 395.

(c) A different situation exists, however, in respect to those transactions where, though charged for the pick-up and delivery service, the shipper or the consignee does not avail himself thereof but claims and is allowed a refund of five cents per 100 pounds. As to such transactions, the railroad is released of its obligation to furnish the service by request, and, under the express terms of the published tariffs, an adjustment of rate is mandatory on its part. It has performed no service corresponding to the charge it made and has not "earned" any part of the charge. It is as if the railroad made an overcharge on a shipment, and it should follow that the charge should not be included in its gross earnings.

The situation is parallel to one where mileage allowances are made to a shipper for use of its own cars, with respect to which we said in State v. M. & St. L. R. Co. 204 Minn. 250, 254, 283 N. W. 244, 246: "It is not a deduction from gross earnings as such but an adjustment of the rate. The freight tariff less the mileage is in fact gross earnings."

The trial court improperly included in defendant's gross earnings the amounts so allowed to shippers and consignees not availing themselves of the pick-up and delivery service.

### LOCOMOTIVE RENTALS

(d) During the years 1935, 1936, and 1937, defendant leased to the Minnesota and International Railway Company certain steam locomotives for the latter's exclusive use on a year-to-year basis. The locomotives were used by the lessee in the operation of its own line of railway within this state during the whole of said period. The lessee annually reported its gross earnings without deduction of the rental of said locomotives. Defendant, on the other hand, claiming that such rentals were not a part of its gross earnings, omitted the rentals in its reports thereof.

In determining whether this item was properly excluded by the trial court in computing defendant's gross earnings, we must again revert to our original theme and ask: Were these rentals income from "sources incidental to the transportation business?" The

trial court's negative answer was apparently bottomed on the theory, urged by defendant, that a lease of its surplus locomotives for the exclusive use of the M. & I. was equivalent to a sale thereof, within the rule of State v. M. & I. Ry. Co. 106 Minn. 176, 118 N. W. 679, 1007, 16 Ann. Cas. 426, excluding sales of old and worn-out cars and appliances and of surplus equipment from gross earnings computations. The cited case, however, also holds that rentals received by one railroad from another for "equipment, such as steam shovels, hoisting machinery, work trains, cars and engines, including crews, etc." are taxable as gross earnings of the owner.

The rule here controlling is the one applicable to rental of equipment and not the one applicable to sales thereof. The fact that the locomotives involved were surplus or even obsolete equipment would not make the leasing equivalent to a sale thereof, nor otherwise remove from the gross earnings basket the rentals received from such leasing.

### HEAD OF THE LAKES TRAFFIC

■ The revenue received by defendant from its so-called Head of the Lakes traffic involves interstate shipments, and its proper allocation presents a different problem from those we have been considering. The answer requires an examination of Minn. St. 1941, §§ 295.01, subd. 2, 295.02 (Mason St. 1927, §§ 2247, 2246), relating to the computation of earnings derived from interstate business, and, incidentally, the construction of a contract between the state and the defendant, and a consideration of the effect of a long-standing practice in computing earnings from such interstate business on the basis of an assumed, rather than the actual, movement of the traffic.

Defendant, since the year *1900,* has owned and operated two alternate lines of railroad between Carlton, Minnesota, and Duluth, Minnesota. The northerly line is 20.9 miles long and lies wholly within the state of Minnesota; the southerly line is 27.5 miles long and extends for 11.7 miles into and through the state of Wisconsin and the city of Superior, Wisconsin, and thence into Duluth. The

northerly line has heavy upgrades from Duluth to Carlton, while the southerly and interstate line has relatively light grades. Because of these grades, the northerly route is generally used for the transportation of freight destined for Duluth and Superior and points east thereof, while the southerly route is generally used for the transportation of freight from these cities and points. Some passenger trains operate in both directions via the northerly route, while other passenger trains similarly operate via the southerly route.

The northerly line was part of the line of railroad of the St. Paul & Duluth Railroad Company, which extended from St. Paul and Minneapolis to Duluth via White Bear Lake and Carlton. It was acquired by defendant by purchase from the said St. Paul & Duluth Railroad Company on or about June 15, 1900. The legality of the purchase having been challenged by the attorney general in a suit brought to have it set aside, defendant, on September 12, 1900, executed and delivered to the state a written undertaking or agreement, which provided, *inter alia:*

"The Northern Pacific Railway Company acknowledges and covenants that it holds the said railways purchased from the St. Paul & Duluth Company *subject to all the public obligations* in favor of the State of Minnesota, the people of the state, or the Board of Railroad and Warehouse Commissioners of the state, which would exist in favor of said state, or the people, or the Board of Railroad and Warehouse Commissioners, with respect to said railways and the traffic thereof as against the St. Paul & Duluth Railroad Company, if said sale had not been made; and the said Northern Pacific Railway Company further covenants and agrees that it will forever operate and maintain the said line of railway wholly within the state of Minnesota between the cities of St. Paul and Duluth, with a branch to Minneapolis, in connection with the terminals hereinafter referred to." (Italics supplied.)

Prior to the purchase, defendant had only the interstate route between Carlton and Duluth, and had accordingly computed its gross earnings taxes by prorating the actual mileage between Min-

nesota and Wisconsin. . After the purchase, defendant had a choice of alternate routes, both over its own lines of railroad, but, because of favorable grades, most of its eastbound freight trains traveled over the northerly or intrastate route, while its westbound freight trains went over the southerly, or interstate route. Until 1937, defendant did not follow the statutory method of reporting its gross earnings from such interstate traffic. Instead, commencing about 1903 and continuing until 1937, it reported its gross earnings from Head of the Lakes freight traffic by apportioning a part thereof to Minnesota on the basis of mileage in assumed movements, not necessarily corresponding with the actual route over which said traffic moved, as follows:

"(1) Carload traffic destined to Duluth (unless originating between Carlton and the Wisconsin line on the southerly route); via the northerly or intrastate line.

"(2) Carload traffic to Superior and points east in Wisconsin (except ore from the Cuyuna Range and traffic originating between Carlton and the Wisconsin state line); via the northerly intrastate line to Duluth and thence to Superior.

"(3) Carload traffic from Duluth or from Superior destined to Carlton or points south of Carlton; via the northerly or intrastate line.

"(4) Carload traffic from Duluth or Superior destined to points west of Carlton; via the southerly or interstate line.

"(5) Carload traffic from points east of Superior; via the southerly or interstate line.

"(6) Ore from the Cuyuna Range and traffic originating between Carlton and the Wisconsin state line destined to Superior and points east thereof; via the southerly or interstate line."

No such assumptions were made in determining the gross earnings from the transportation of passengers and mail to and from Duluth and Superior and points east thereof. Since at least 1903, the actual mileage in Minnesota and Wisconsin over which passengers and mail were transported to and from the Head of the

Lakes has been in each case determined and earnings reported accordingly.

The method used in reporting its gross earnings from Head of the Lakes freight traffic was adopted with the consent of the state taxing authorities and was continued from year to year by defendant, upon advice of its general counsel that it should be so continued as a matter of policy, "considering other serious questions which were involved" in the litigation following the acquisition of the St. Paul & Duluth Railroad Company's line.

The pursuance of this policy proved expensive, especially in later years. During 1934, 1935, and 1936, the "assumed movement" method then used resulted in the apportionment as gross earnings of substantially greater amounts than would have been reported if the apportionment had been made on the basis of the actual mileage in Minnesota. For 1934, the difference was $105,000; for 1935, $111,000; and for 1936, $131,383.

Accordingly, in 1937, defendant abandoned its practice of reporting gross earnings on the basis of assumed movements; instead, it reported all earnings on intrastate freight business to and from the Head of the Lakes, plus a proportionate share of its earnings on interstate freight business passing through, into, or out of the state to and from Duluth and Superior and points east thereof, computed on *actual mileage* rather than on *assumptions*. By this suit the state seeks to recover the difference between the gross earnings so computed and reported, and the gross earnings which would have been apportioned to Minnesota if the customary assumptions had been applied. The state grounds its right of recovery upon the contract with the state, from which we have quoted, and upon, what it terms, a practical construction thereof, rather than upon the terms of the statute itself.

The alleged omitted earnings for 1937 consist exclusively of earnings in fact apportionable to Wisconsin and not to Minnesota, and, absent any valid contract or binding practice, such omitted earnings are not taxable.

"The term 'the gross earnings derived from the operation of such

line of railway within this state,' as used in section 295.02, is hereby declared and shall be construed to mean all earnings on business beginning and ending within the state and a proportion, based upon the proportion of the mileage within the state to the entire mileage over which such business is done, of earnings on all interstate business passing through, into, or out of the state." Minn. St. 1941, § 295.01, subd. 2 (Mason St. 1927, § 2247).

This statute has been construed to limit gross earnings "to the business done within the state" (State v. G. N. Ry. Co. 163 Minn. 88, 93, 203 N. W. 453, 455), and "If interstate business is involved, only that earned from the transportation within the state may be included."

The statutory method of apportioning earnings on interstate business passing through, into, or out of the state is exclusive. No power exists in the office of the attorney general or any other executive branch of the government, by contract or otherwise, to substitute another method, however more advantageous it might be to the state. 61 C. J., Taxation, §§ 10, 11; State v. Illinois Cent. R. Co. 200 Minn. 583, 594, 595, 274 N. W. 828, 275 N. W. 854, 855; Inhabitants of Southborough v. Boston and W. St. Ry. Co. 250 Mass. 234, 145 N. E. 422; State ex rel. Bennett v. State Board, 40 Mont. 59, 64, 104 P. 1055, 1057; 1 Cooley, Taxation (4 ed.) § 65.

The limitations upon the powers of the attorney general, it may properly be argued, are for the protection of the public and not for the protection of the other contracting party: *a priori,* the railroad here should not be allowed to invoke the limitation upon the attorney general's power to the harm of the public. See 38 Am. Jur., Municipal Corporations, § 514; Bell v. Kirkland, 102 Minn. 213, 113 N. W. 271, 13 L.R.A.(N.S.) 793, 120 A. S. R. 621 (dictum); City of Fergus Falls v. Fergus Falls Hotel Co. 80 Minn. 165, 83 N. W. 54, 50 L. R. A. 170, 81 A. S. R. 249; City of Madison v. American Sanitary Eng. Co. 118 Wis. 480, 511, 95 N. W. 1097, 1108.

If the 1900 contract, by its terms, clearly indicated that it was the intention of the parties to adopt the "assumed movement" method of computing gross earnings in the future, this might be a

proper case for the application of the above rule. But, absent any power to change the statutory tax rate by contract, we cannot assume that the language of the contract was intended to accomplish such result. The contract is wholly silent as to any method to be adopted in computing gross earnings of the consolidated railroads. No reference is made to "assumed movements" of the Head of the Lakes freight traffic. There is nothing in the agreement which purports to create any obligation with respect to the routing of traffic. It merely binds defendant to "forever operate and maintain" the intrastate line of railroad and terminals, and not to establish higher rates for freight moving over that line than for freight moving over the interstate line. Most liberally construed in favor of the state, the covenant that "The Northern Pacific Railway Company acknowledges and covenants that it hold said railways purchased from the St. Paul & Duluth Company subject to all the public obligations in favor of the State of Minnesota" cannot be interpreted as an agreement to adopt other than the statutory formula in computing gross earnings. Defendant met "all the public obligations in favor of the state" by continuously maintaining and operating the line of railroad which it purchased, even though in doing so it did not preserve the former ratio as to volume of freight moving over the intrastate and interstate lines.

Nor can any agreement to pay gross earnings taxes upon the "assumed movement" basis be grafted upon the 1900 contract by practical construction thereof by the parties. Practical construction controls only where the contract is ambiguous; it will not control unless it is one which reasonable minds might adopt. Wicker v. Modern L. Ins. Co. 194 Minn. 447, 261 N. W. 441. Nor could the parties by practical construction of the contract violate or infringe upon the constitutional requirement of uniformity in taxation. The construction of the 1900 agreement proposed by the state is not one which could reasonably be adopted, and it must therefore be ignored.

The practice of using "assumed movements" in reporting gross earnings, which apparently began in 1903—three years after the

contract was made—is not referable to the contract. There is no showing that the practice resulted from any demand by the taxing authorities or that it was anything but a convenient method of reporting earnings from the Head of the Lakes traffic, which the state acquiesced in and which the railroad company, as a matter of policy, was loath to change, notwithstanding it resulted in higher taxes. The state was not prejudiced by use of the formula, nor did it change its position in any respect as a result thereof. Hence, neither the rule of practical construction nor the doctrine of estoppel could prevent defendant from changing to the statutory basis in reporting its gross earnings from this traffic. So far as performed or executed by the voluntary payment of the tax, the $900 contract and subsequent conduct of the defendant railroad may prevent it from seeking refunds; but beyond that such contract and conduct have no binding effect. State v. G. N. Ry. Co. 106 Minn. 303, 324, 119 N. W. 202, 206.

The lower court, therefore, properly held defendant accountable only for gross earnings computed upon the statutory formula.

Cause remanded for further proceedings in accordance with this opinion.

