**ANDREWS VAN LINES, INC., a corporation, and Security Van Lines, Inc., a corporation, Plaintiffs,**

**v.**

**UNITED STATES of America, and Interstate Commerce Commission, Defendants.**

**Civ. A. No. 735 L.**

United States District Court
D. Nebraska.

April 19, 1965.

J. Max Harding, of Nelson, Harding & Acklie, Lincoln, Neb., for plaintiff Andrews Van Lines, Inc. and intervening plaintiff Security Van Lines, Inc.

Gerald Kadish, Dept. of Justice, Washington, D. C., for defendant United States.

Thomas H. Ploss, Washington, D. C., for defendant I. C. C.

Before JOHNSEN, Circuit Judge and ROBINSON and VAN PELT, District Judges.

ROBINSON, Chief Judge.

This is a proceeding before a three-judge court to have reviewed the findings and order of the Interstate Commerce Commission in regard to applications made by the plaintiff Andrews Van Lines, Inc., and the intervening plaintiff, Security Van Lines for certificates of public convenience and necessity authorizing the continuation of operations in interstate or foreign commerce as common carriers by motor vehicle, between points in Alaska on the one hand, and on the other hand, points in the contiguous 48 states. Jurisdiction exists in this Court pursuant to the provisions of 28 U.S.C. § 1336; venue pursuant to 28 U.S.C. § 1398.

Both of the plaintiffs have been involved in the transportation of household goods to and from Alaska using basically a motor-water-motor type system of transportation. When transporting goods to Alaska from the contiguous 48 states, plaintiffs transport the goods by motor vehicle to the State of Washington, most often Seattle. There the goods are sealed in a van for shipment to Alaska by water. Upon arrival in Alaska, the vans are picked up either by a railroad and delivered to the designated point or by an Alaskan trucking concern [Artic Moving & Storage Company] which delivers the goods. On occasion, air transportation has been used and increasingly use has been made of the Alcan highway through Canada for overland motor vehicle shipments.

Neither company owns any real estate or trucking equipment in Alaska, Arctic Moving & Storage has basic control over all deliveries made and hires and pays all personnel involved in the Alaskan transportation. Public liability insurance is provided both by plaintiffs and by the Alaskan trucker. Plaintiffs remain responsible to the shipper although in the case of Security Van Lines, charge backs are made to Arctic Moving on any claims arising from Arctic's fault. None of the sea vans used for sea shipments are owned by Andrews.

By way of background the people of Alaska voted to accept statehood under the terms of the Alaska Statehood Act on August 26, 1958. On January 3, 1959, Alaska formally became our 49th state and for-hire motor carriers operating in interstate or foreign commerce concurrently became subject to Part II of the Interstate Commerce Act. The Alaska Statehood Act did not attempt to deal with the many facets of transportation affected by the new status of statehood, such omission apparently being purposeful so that transportation problems might subsequently be considered in their various aspects.

In 1960 Congress added Alaska "grandfather" provisions to the Interstate Commerce Act. [Pub.L.–86–615 § 1, 74 Stat. 382]. The plaintiffs filed their present applications under that provision. Hearings were had and on December 18, 1963, the Interstate Commerce Commission denied the applications, adopting the report and order made by hearing examiners on July 10, 1963. Exceptions were taken and on January 13, 1964, the final Deci-

sion and Order of the Interstate Commerce Commission, Division 1, was served on the parties, ordering that the applications be denied. Plaintiffs then requested a finding of an issue of general transportation importance which was denied by an Order from the Interstate Commerce Commission on February 26, 1964, thus exhausting the administrative remedies of the plaintiffs and setting the stage for the present proceeding.

The pertinent part of the controlling statute, Sec. 206 [a] [4] of the Interstate Commerce Act, now provides:

" * * * any common carrier by motor vehicle, which, on the date this paragraph takes effect, is the holder of a certificate or certificates described in paragraph (2) of this sub-section or issued under paragraph (3) of this sub-section or section 207(a), authorizing transportation by motor vehicle between places in the United States of passengers or property in commerce between the United States and the territory of Alaska, and on August 26, 1958, it or its predecessor in interest was engaged in the transportation of passengers or property as a common carrier by motor vehicle between places in the United States and places in Alaska, and such operations have been continued since that time * * * except * * * as to interruptions in service over which the carrier or its predecessor in interest had no control, shall be issued a certificate authorizing transportation to or from the points or areas in Alaska served by it, from or to all points in the other States of the United States designated in the above-mentioned certificate or certificates held by the carrier, of passengers or the class or classes of commodities specified therein, to the extent that under the said certificates the carrier, prior to the date of admission of Alaska into the Union, was authorized to perform within the States all the transportation required for through motor vehicle transportation by the carrier to or from places in the Territory of Alaska, without necessity will be served thereby and without further proceedings, if application for such certificate is made to the Commission as provided herein on or before December 31, 1960."

The important date, then, is August 26, 1958, at which time an applicant under this provision must have been "engaged in the transportation of passengers or property as a common carrier by motor vehicle between places in the United States and places in Alaska." It is the plaintiffs' contention, of course, that they were so engaged. More specifically, they contend that the Commission applied a more stringent standard of proof in applying this section than that which Congress intended and that it erred in not considering evidence of transportation to Alaska other than overland motor vehicle shipments. The Commission contends that it has jurisdiction only over such overland shipments and that any other modes of transportation are thus irrelevant in the application of the "grandfather" provisions.

■ We agree with the plaintiffs' contention that the statute in question should be liberally construed. The history of the provision, coupled with a pertinent omission in the wording lead us to that conclusion.

■ The requirement that a carrier be engaged in "bona-fide operations" has been conspicuously left out of the statute. This wording has graced the structure of most "grandfather" provisions in this area. "That standard carries the connotation of substantiality. It also makes clear that a holding out to serve a specified area is not alone sufficient. It is 'actual rather than potential or simulated' service which is required. * * * Substantial, as distingushed from incidental, sporadic, or infrequent, service is required." United States v. Carolina Freight Carriers Corp., 315 U.S. 475, 62 S.Ct. 722, 86 L.Ed. 971 [1941].

■ In a case involving an application for a "grandfather" provision by an

Alaskan trucking line, Al Renk & Sons, Inc.—Alaska "Grandfather" Application, 89 M.C.C. 91, it was very aptly pointed out:

"In the light of the known conditions prevailing in Alaska, and the legislative history of the 'grandfather' provisions, under consideration, the omission of the customary phrase, 'bona fide operations' must have been deliberate. It must have been the intention of Congress not to require Alaskan 'Grandfather' applicants to prove that their operations on and after the critical date were as substantial and as frequent as those required in previous legislation to support a grant of 'grandfather' authority."

Without further quotation, suffice it to say that the historical background of this provision surely indicates an intention by Congress that the wording should be liberally construed. This was done in accordance with what was deemed to be the economic interest of Alaska and in consideration of a presently sparse flow of traffic. The continued operation of many of these lines was intended to influence the further economic growth of the area.

However, we find it to be equally clear that the liberal construction of the statute intended by Congress was aimed at the substantiality of the operations and not the mode of transportation. It was not to be required that a large and steady flow of operations be established before the "grandfather" provision would apply, but this has no reference to whether or not a motor vehicle must be involved in the action. The statute expressly and impliedly refers to motor vehicles. Any liberal construction to be applied is and must be applied only to motor vehicles, lest construction turn to destruction of the words themselves. The Interstate Commerce Commission does not have the power to grant a certificate under the "grandfather" provision to allow the continuance of operations other than that of motor vehicles.

Along the same line, the same Act which added the "grandfather" provisions continued the jurisdiction of the Federal Maritime Board [now Federal Maritime Commission] over certain motor-water-motor or motor-water-land operations in § 303 [e] [3] of the Interstate Commerce Act [49 U.S.C. § 903 [e] [3]:

"Notwithstanding any other provision of this Act, any common carrier by motor vehicle which was engaged also in operations between the United States and Alaska as a common carrier by water subject to regulation by the Federal Maritime Board under the Shipping Act of 1916, as amended, and the Intercoastal Shipping Act of 1933, as amended, prior to January 3, 1959, and has so operated since that time, shall as to such operations, remain subject to the jurisdiction of the Federal Maritime Board."

The Federal Maritime Board issued a report pertinent to our proceedings, published at 6 F.M.B. 245, [1961] in which the Board said the following at page 251:

"The entity which constitutes a 'common carrier by water in foreign commerce' as defined in the first section of the Act is subject to the provisions of the Act. The term 'common carrier' is not defined but the legislative history of the Act indicates that the person to be regulated is the common carrier at common law; One who holds himself out to carry for hire the goods of those who choose to employ him. Bauana Distributors, Inc. v. Grace Line, Inc., 5 F.M.B. 615, 620 [1959]. We have also held that a respondent's status as 'common carrier' does not depend on its ownership or control or means of transportation, but rather on the nature of its undertaking with the business which it serves. Where a party 'undertakes to transport from door to door it is a common carrier over the entire limits of its routes, both the portion over land and the portion over sea.' Where the respondent assumed complete responsibility for the safe transportation and

delivery of goods entrusted to it from the time of receipt from the shipper until arrival at ultimate destination, it was held to be a common carrier by water. Bernhard Ulmann Co., Inc., 3 F.M.B. 771 [1952.]"

From the nature of the plaintiffs' activities as they appear on the record, it would seem that they come within the above description of a common carrier by water so as to come within the jurisdiction of the Federal Maritime Commission, at least insofar as the shipping from Seattle to Alaska and vice versa.

Plaintiffs contend that the mode of transportation *extra* United States territory should be reduced to a common denominator so that the fact alone that shipments of some kind have been made would render plaintiffs eligible for treatment under the "grandfather" provision. In the face of the express wording of the statute, i. e., "motor vehicles" and the fact that the Federal Maritime Commission has jurisdiction over the intercoastal shipping, we cannot accept this contention of the plaintiffs. This activity of the plaintiffs is simply beyond the jurisdiction of the Interstate Commerce Commission and as such is not relevant to any proceedings for relief under the "Alaska Grandfather" provision.

The plaintiffs have also cited a few recent decisions of the Interstate Commerce Commission which, they contend, indicate that water movements should be considered by the Commission in an application for certificates. Two of these decisions relate to applications for certificates to transport between certain points in Alaska. The Commission in those cases points out that it makes no difference that water movements were used in transporting the goods to Alaska, since the activities in Alaska were clearly those of the applicants. The use of water was simply not considered to be a determinative point, one way or the other, insofar as it had no connection with the Alaskan activities. Alaska Van & Storage Co., Inc., 94 M.C.C. 381; Hepp & Chapados Alaska "Grandfather" Applic., 94 M.C.C.

475. We do not believe that these cases have any application to the questions presented here.

In Reliable Transfer Corporation Extension—Southeast Alaska, [No. MC–123297]—— M.C.C. ——, the Commission had another application for a certificate permitting transportation between points in Alaska. In that case, part of the transportation was by water [over the Marine Highway in Alaska] and the Commission considered this in granting the application. This case is distinguishable on many grounds and was apparently decided on its own particular set of facts. There the water movement was the only mode of transportation because of the Alaskan terrain, the trucks themselves were transported rather than containers for the goods, the shipper never took control of nor responsibility for the goods [the movement was between points in Alaska rather than between Alaska and the contiguous 48 states,] and the trip was mostly on inland water. The Commission apparently determined that this is in effect a type of motor vehicle transportation because of the inherent nature of the thing. They also determined that the question of application of the Shipping Act of 1916 need not be answered. As we have pointed out above, we find that the Shipping Act must be considered in the case before us and in fact strips the Interstate Commerce Commission of jurisdiction over the water segment of the present application. For these reasons we feel that this case has no application to the proceeding before us now.

 In regard to the overland motor vehicle shipments made by the plaintiffs we must also confirm the decision of the Commission. Andrews had admitted that it made no such shipment until 1959, obviously beyond the critical date of August 26, 1958, at which time such activities must have been engaged in to allow application of the "grandfather" provisions. Security appears to have engaged to a very small extent in overland shipments at and/or prior to the critical date, but there is sufficient evidence in

the record to support the finding made by the Commission that this was not sufficient even under a liberal construction of the statute to meet the requirements of the "grandfather" provision in regard to continuous operations. In the light of the foregoing, we have no choice but to confirm the Commission's findings in respect to actual overland shipments made by these plaintiffs. We may not, of course, substitute our own judgment for that of the Commission when it is acting within the scope of its authority and is supported by substantial evidence. Watson Bros. Transp. v. United States, 59 F.Supp. 762. [D.C.Neb.1945].

The next point of importance concerns the purported agency agreements with the Alaskan truckers. If agency agreements had been adequately established, the plaintiffs would be in a better position to ask relief at least in respect to shipments between points in Alaska. However, we can find no such adequate proof.

To have found the type of agency relationship necessary in this instance, the Commission must have found that plaintiffs dominated, controlled, and directed the operations to such an extent that they became, equivalently, the principals' operations. Thomson v. United States, 321 U.S. 19, 64 S.Ct. 392, 88 L.Ed. 513 [1944]. The shipment here was done with one bill of lading in one of the plaintiff's mastheads and at through rates published by plaintiffs. But these factors standing essentially alone as they do here are not sufficient to find the alleged agency and resultant control. We are satisfied that the record discloses sufficient evidence to find that the Alaskan "agent" was independent to a great enough extent that plaintiffs should not be allowed relief on that score.

An interesting point to note is that the result of these applications could very possibly be three certificates to operate arising out of only one operation. Security and Andrews have already asked for certificates arising from the purported agency. If Arctic Moving & Storage has or does in the future request "grandfather" rights, one operation would result in three certificates if all were to be granted. It was not the intention of Congress that multiple rights be granted from one operation. United States v. Rosenblum Truck Lines, 315 U.S. 50, 53, 54, 62 S.Ct. 445, 86 L.Ed. 671. As we explained above, this result will not occur here, since it has been decided that the agency relationship did not exist. The multiple licensing possibility is one more reason in our opinion to affirm the decision and findings of the Commission.

In any case, we can see no reason why the grant or denial of a certificate of public convenience and necessity will have any effect on the operations of the plaintiffs—at least in respect to the methods which have been most often used by them. There will be no problems created in regard to the water transportation as pointed out above, and there is no reason why operations in Alaska cannot be continued as in the past. We can see no injury to the plaintiffs whatsoever by the decision herein made unless the plaintiffs have determined to change to more of an overland transportation than they used in the past. This, of course, would not help them to qualify for the "grandfather" provisions.

The foregoing shall constitute findings of fact and conclusions of law under Rule 52 [a] of the Federal Rules of Civil Procedure.

A Judgment denying the relief sought by the Complaint and dismissing the action will be entered forthwith.