### LINCOLN MILLS OF ALABAMA, Appellant,

v.

### TEXTILE WORKERS UNION OF AMERICA, CIO, Appellee.

No. 15697.

United States Court of Appeals
Fifth Circuit.

Jan. 31, 1956.

4. Footnotes of Tax Court omitted.

82

Brown, Circuit Judge, dissented.

Frank A. Constangy, Atlanta, Ga., Patrick W. Richardson, Robert K. Bell, Bell, Morring & Richardson, Huntsville, Ala., for appellant.

Jerome A. Cooper, Wm. E. Mitch, Hugo L. Black, Jr., Birmingham, Ala., Benjamin Wyle, New York City, and Cooper, Mitch & Black, Birmingham, Ala., for appellee.

Before RIVES, JONES and BROWN, Circuit Judges.

JONES, Circuit Judge.

Lincoln Mills of Alabama, the defendant below, is a corporation owning and operating a textile mill in Huntsville, Alabama. It is engaged in an industry affecting commerce and hence subject to Federal legislation relating to labor. Textile Workers Union of America, CIO, the plaintiff below, is an unin-

corporated association and labor organization. We will refer to the parties, for brevity and clarity, as Employer and Union.

In chronological sequence, the facts from which this controversy developed were as follows:

A written collective bargaining agreement between the Union and the Employer was executed June 27, 1953, to continue until July 3, 1954, and for one-year terms thereafter unless written notice of termination should be mailed by either party to the other sixty days prior to the end of the current term, in which event the agreement would terminate at the end of the current term. Article VIII of the agreement set up procedures to be followed in the adjustment of grievances, and provided that if a grievance had not been adjusted by the Article VIII procedures within the time specified, the party presenting the grievance should be governed by the provisions of Article IX(F) of the agreement.

By Article IX of the agreement the parties agreed that the contract grievance procedures were adequate to provide a fair and final determination of all grievances arising under the terms of the agreement. The desire of the parties to avoid strikes and work stoppages was recited. Paragraphs (A) to (E) inclusive of Article IX contained "no-strike" provisions. In Paragraph (F) of Article IX, of the agreement it was provided that any disagreement or dispute, arising from the operation or interpretation of the agreement, pertaining to wages, rates of pay, hours of work or other conditions of employment which had not been satisfactorily adjusted within the time limited, might be submitted to arbitration by the giving of written notice within ten days after the expiration of the applicable time limit. It was further provided that if the parties did not agree upon an arbitrator, the American Arbitration Association should be requested to furnish the names of five qualified arbitrators and the parties should alternately strike one name each from the list until a single name remained and the person so designated should serve.

The Union filed with the Employer seven grievances on June 23, 1954, and three grievances on June 24, 1954, all of which were of the type specified in Article IX(F). The Employer followed the procedures of the agreement up to the point of rejecting the claims, the rejections being made at various dates on and subsequent to July 14, 1954. Pursuant to timely notice given pursuant to its terms, the agreement terminated on July 3, 1954. The Union requested the Employer to submit the grievances to arbitration pursuant to Article IX(F) of the agreement. The Employer refused to do so. Thereafter the Union brought this suit against the Employer asking that the Employer be required to submit the grievances to arbitration and praying for damages. The District Court declined to award damages to the Union, saying that none were proven, but decreed that the Employer submit the grievances to arbitration as provided in Article IX(F) of the agreement. Jurisdiction was found under § 301 of the Labor Management Relations Act of 1947, 29 U.S.C.A. § 185.

Presented for our consideration are questions which may be substantive as well as procedural. Since there is no diversity of citizenship apparent we are, at the outset, required to ascertain whether there is a basis for Federal jurisdiction. The Congress has provided that:

"Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce * * * may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties". Sec. 301 (a), Labor Management Relations Act of 1947, 29 U.S.C.A. § 185(a).

This grant has given Federal courts jurisdiction for the consideration and determination of questions such as the

one presented in this case. It has given to Federal courts the power to adjudicate, where a violation of a contract is asserted, causes of action between employers and labor organizations and to determine whether or not a cause of action exists in a particular case. It does not follow, though, from the existence of the judicial power to determine a cause of action or controversy that the right asserted has legal sanction. It does not follow from the grant of jurisdiction to hear a litigant in a Federal forum that rights have been created or remedies provided which are denied to others. That there is a right to seek relief in a Federal court does not mean that the relief sought is necessarily available. More specifically, our question is whether Section 301, taken in context, requires or permits the enforcement of an executory covenant for the submission to arbitration of grievances pursuant to a collective bargaining agreement between a union and an employer.

■ The provisions of the contract between the parties to this appeal from which spring the problems presented are not novel, yet we do not find that the precise point presented has heretofore been considered by an appellate court. In the absence of statute it is the general rule that executory contracts to submit disputes to arbitration will not be specifically enforced. Red Cross Line v. Atlantic Fruit Co., 1924, 264 U.S. 109, 44 S.Ct. 274, 68 L.Ed. 582. Tejas Development Co. v. McGough Bros., 5 Cir., 1947, 165 F.2d 276. Such is the rule as found by the framers of the Restatement of the Law. Restatement, Contracts, § 550 (1932). The Supreme Court of Alabama, announcing the rule, has said:

"The courts are almost unanimous in declaring that equity will not decree specific performance of a contract to submit a cause to arbitration, while it will, in proper cases, entertain a bill to enforce an award." Ex parte Birmingham Fire Ins. Co., 1937, 233 Ala. 370, 172 So. 99, 101.

■ If there be a right to specific performance of an arbitration provision in a collective bargaining agreement we must find it in an act of Congress. The Norris-LaGuardia Act, 29 U.S.C.A. § 101 et seq., does not preclude the granting of the relief sought. Graham v. Brotherhood of Locomotive Firemen and Enginemen, 1949, 338 U.S. 232, 70 S.Ct. 14, 94 L.Ed. 22.

The United States Arbitration Act expressly provides that nothing therein "contained shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C.A. § 1.

In Section 2 it is said:

"A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." July 30, 1947, c. 392, § 1, 61 Stat. 669, 9 U.S.C.A. § 2.

Section 3 of the Arbitration Act provides:

"If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agree-

ment, providing the applicant for the stay is not in default in proceeding with such arbitration." 9 U.S. C.A. § 3.

The Arbitration Act also provides that courts of the United States may direct arbitration in accordance with the terms of written agreements. 9 U.S.C.A. § 4.

The Court of Appeals of the Third Circuit has had a number of occasions to consider the application of the Arbitration Act to collective bargaining agreements, and we cannot reconcile its views as expressed in its several opinions. It first held that the stay of proceedings provisions in Section 3 of the Act applied in a class suit for unpaid over-time compensation claimed under the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq. Donahue v. Susquehanna Collieries Co., 3 Cir., 1943, 138 F.2d 3, 149 A.L.R. 271. Section 1 of the Arbitration Act, containing the exclusion clause was set forth in a footnote but was not mentioned in the opinion. The Donahue case, supra, was followed in Watkins v. Hudson Coal Co., 3 Cir., 1945, 151 F.2d 311, certiorari denied 327 U.S. 777, 66 S.Ct. 522, 90 L.Ed. 1005, where it was said that the exclusion clause of Section 1 was not an over-all limitation. On a second appeal of the Donahue case a stay of proceedings was directed pursuant to Section 3 until arbitration was had. Donahue v. Susquehanna Collieries Co., 3 Cir., 1947, 160 F.2d 661. The same result was reached in Evans v. Hudson Coal Co., 3 Cir., 1948, 165 F.2d 970. Before the next consideration of the question by the Third Circuit, Congress had reenacted the United States Arbitration Act and had included in the reenactment the following catch line of Section 1, " 'Maritime Transactions' and 'Commerce' Defined; Exceptions to Operation of Title". Act of July 30, 1947, H.R. 2084, ch. 392, 61 Stat. 669. This, thought the court, in the next case before it, indicated a congressional intent that the exclusion in Section 1 applied to the entire Act, and it was held that collective bargaining agreements were "contracts of employment" within the meaning of the Act. Amalgamated Ass'n, etc. v. Pennsylvania Greyhound Lines, 3 Cir., 1951, 192 F.2d 310. This was followed in Pennsylvania Greyhound Lines v. Amalgamated Ass'n, 3 Cir., 1951, 193 F. 2d 327.

In the most recent of the Third Circuit cases which we have noted, it was said by a divided court that a collective bargaining agreement between an employer producing goods for subsequent sale in interstate commerce, as is the employer in the case before us, and a union, is within the meaning of a contract in an "industry affecting commerce" as used in Section 301 of the Labor Management Relations Act of 1947, but that such a contract is not one of " 'employment of * * * workers engaged in foreign or interstate commerce' " within the exclusion clause of Section 1 of the Arbitration Act. A majority of the court reconciled the decision with the prior holdings by saying that the two Pennsylvania Greyhound Lines cases involved employees engaged in interstate transportation, excluded by Section 1, and that the other earlier cases involved employees producing goods for subsequent resale in commerce, and not covered, said the court, by the exclusion clause. Two of the judges thought that collective bargaining agreements were not "contracts of employment" within the purview of Section 1 of the Arbitration Act, and were of the belief that the Pennsylvania Greyhound Lines cases should be expressly overruled. Two judges dissented. The court directed the granting of a stay pending arbitration. Tenney Engineering, Inc., v. United Electrical R. & M. Workers, 3 Cir., 1953, 207 F.2d 450, 451.

The Fourth Circuit departs from the Third Circuit and has held that the Arbitration Act does not authorize enforcement of arbitration provisions in collective bargaining agreements. Speaking for the Court and referring to Section 1 of the Arbitration Act, Chief Judge Parker has said:

"Art. I of that Act of February 12, 1925, c. 213, as reenacted by the Act

of July 30, 1947, c. 392, 9 U.S.C.A. § 1, contains nothing but definitions of 'maritime transactions' and 'commerce' and an excepting clause; and we think it clear that the excepting clause was intended to apply to the entire act." International Union, etc., v. Colonial Hardwood Floor Co., 4 Cir., 1948, 168 F.2d 33, 35.

The Colonial Hardwood case was followed in United Electrical R. & M. Workers v. Miller Metal Products, 4 Cir., 1954, 215 F.2d 221.

It seems to us that the Sixth Circuit originally reached the same conclusion as had been pronounced in the Fourth. In a well reasoned opinion by Judge Hamilton wherein the first Donahue case, supra, is criticized, it is said:

"The scope of the exception or proviso in the statute must be gathered from the view of the whole law, and if the language of the exception is in perfect harmony with the general scope of the entire statute, the exclusion is applicable to the whole act. It is clear that the exception here in question was deliberately worded by the Congress to exclude from the National Arbitration Act all contracts of employment of workers engaged in interstate commerce. Section 2 of the Act makes valid and irrevocable all arbitration agreements in writing to submit to arbitration future controversies arising out of the contract of which the arbitration agreement was a part. It would be senseless to say that the exclusion from the Act covers the validity of the contract, but excludes the stay provision of Section 3. The reason for the exclusion is applicable to the entire Act. The language of the exclusion 'herein contained' is found in the first section of the Act. This section is made up entirely of definitions and exceptions to the operation of the title. 'Herein' as used in legal phraseology is a locative adverb and its meaning is to be determined by the context. It may re-fer to the section, the chapter or the entire enactment in which it is used. The fact that it was used in the present Act in a section where none of the substantive matter set up in the succeeding sections of the Act appeared must mean that it is to be applied to the whole Act and not to any given section. There can be no doubt that the contract in issue is a contract of employment. Appellant insists that the exception relates only to the subject specified in the title. If we give full weight to appellant's contention, its argument must fail because the title not only states that its purpose is to make valid arbitration contracts but also to make them enforceable. Section 3 sets up one of the methods of enforcement." Gatliff Coal Co. v. Cox, 6 Cir., 1944, 142 F.2d 876, 882.

But in a later case from the Sixth Circuit the court notes the conflicts. It adhered to its earlier view that the exclusion proviso of Section 1 of the United States Arbitration Act applies to the entire act, but it held that the collective bargaining agreement before it was a trade agreement and not a "contract of employment" within the exclusion clause. Hoover Motor Express Co. v. Teamsters, Chauffeurs, etc., 6 Cir., 1954, 217 F.2d 49.

As to the effect of the United States Arbitration Act in the case before us, we align ourselves with the Fourth Circuit and hold that the collective bargaining agreement before us is a "contract of employment" within the meaning of the Arbitration Act and as such is excluded from the application of the act by its express terms. The earlier cases and their effect are commented upon in 17 Law and Contemporary Problems 580, and 65 Harv.L.Rev. 1238. Though the Norris-LaGuardia Act does not preclude, the United States Arbitration Act does not authorize the judicial enforcement of a contractual undertaking to submit to arbitration grievances arising under a collective bargaining agreement.

This brings us to the question of whether Section 301(a) of the Labor Management Relations Act of 1947, 29 U.S.C.A. § 185(a), hereinbefore quoted, provides for the enforcement of a provision for arbitration contained in a collective bargaining contract between an employer and a labor organization of employees engaged in producing goods for subsequent sale in interstate commerce. The Court of Appeals of the Tenth Circuit has given us, as dictum perhaps, a succinct answer to the query. It said:

"This statute [29 U.S.C.A. § 185 (a)] is for the purpose only of giving jurisdiction to the federal courts in cases involving labor contracts. It does not give the federal courts any different or additional power than a state court would have if the action had been brought here". Mercury Oil Refining Co. v. Oil Workers Int. Union, CIO, 10 Cir., 1951, 187 F.2d 980, 983.

In a decision from the Second Circuit it is stated:

"But § 301 * * * created a remedy where none existed before and provided a forum in which to enforce it." Shirley-Herman Co. v. International Hod Carriers, etc., 2 Cir., 1950, 182 F.2d 806, 809, 17 A.L.R.2d 609.

In the Shirley-Herman case the remedy to which reference was made as being created by the statute was the right to sue a labor union as such and the right of unions to bring and maintain judicial actions. We think it unnecessary to consider other decisions of the Courts of Appeal or enter upon a review of District Court cases, of which there are a number. The answer to this phase of our inquiry is to be found, we think, in the opinions of the Supreme Court in Association of Westinghouse Salaried Employees v. Westinghouse Electric Corp., 1955, 348 U.S. 437, 75 S.Ct. 489, 494, 99 L.Ed. 510.

Perhaps it cannot fairly be said that the ratio decidendi of the Westinghouse case is more than that a Federal District Court does not have jurisdiction under Section 301 over an action brought by a union against an employer under a collective bargaining agreement on behalf of employees for wages which the employer refused to pay and which refusal the union asserted was in violation of the agreement. But in the several opinions we find a guide for our decision. Mr. Justice Frankfurter, with whose views Justices Burton and Minton concurred, found that if the "plain meaning" rule of construction could be applied, then all Section 301 does is to give procedural directions to the Federal courts to treat labor unions as natural or corporate persons in actions involving collective bargaining agreements, and to do so regardless of the amount in controversy and not to require diversity of citizenship. In considering the intent of Congress, Mr. Justice Frankfurter found that its aim was to open the Federal Courts to such suits solely because they were between the union and employers, but without providing any Federal law other than procedural for such suits. "It was evident", said Mr. Justice Frankfurter, "that the specific desire was to remove procedural obstacles to suit by and against the union." He quoted Senator Taft, in proposing an amendment approximating § 301, as saying:

" ' * * * All we provide in the amendment is that voluntary associations shall in effect be suable as if they were corporations, and suable in the Federal courts if the contract involves interstate commerce and therefore involves a Federal question.' "

A question was raised by Mr. Justice Frankfurter as to whether the construction dictated by the " 'plain meaning rule' " and by the intent of Congress could be placed within the constitutional restriction of Federal jurisdiction to cases arising under the Constitution and laws of the United States, etc., U.S.Const. Art. III, § 2. It was necessary, thought Mr. Justice Frankfurter, to limit the

scope of the Act as "doubtful legislation". The Court of Appeals, in its consideration of the Westinghouse case, had proceeded upon the so-called "eclectic theory" that the collective bargaining agreement is not of itself a contract of hiring, that each employee makes with the employer a separate contract of hiring from which stems the obligation to pay wages, and that, while Section 301 creates "a federal substantive right", there is jurisdiction only of causes of action between a union and an employer. Since the Court of Appeals did not regard a breach of the obligation to pay wages as creating a cause of action in the union, it rejected Federal jurisdiction. Association of Westinghouse Salaried Emp. v. Westinghouse Electric Corp., 3 Cir., 1954, 210 F.2d 623, 625. Mr. Justice Frankfurter disagreed with the Court of Appeals, and indicated his view to be that no new federal law concepts of contractual interpretation were intended by the enactment of Section 301.

Mr. Chief Justice Warren, joined by Mr. Justice Clark, concurred and were of the opinion that it was enough to say that Section 301 was not sufficiently explicit nor its legislative history sufficiently clear to indicate that Congress intended to authorize a union to enforce in a federal court the right of an employee to receive wages; and being of such opinion, they saw no reason to make labor policy or raise constitutional issues. Mr. Justice Reed also concurred in the result. He took the position that it was the intent of Congress to give federal jurisdiction over actions arising from breaches of collective bargaining agreements whether the rules of substantive law are derived from federal or state sources. He concluded, as did the Court of Appeals, that a breach of the duty to pay wages was a violation of an individual employment contract and not of the collective bargaining agreement.

In a dissenting opinion in the Westinghouse case, Mr. Justice Douglas, with whom Mr. Justice Black concurred, there was disagreement with the majority refusal to permit the Union to bring the suit. The minority did, however, concur in the view of Mr. Justice Reed that Congress "created federal sanctions for collective bargaining agreements, made cases and controversies concerning them justiciable questions for the federal courts, and permitted those courts to fashion from the federal statute, from state law, or from other germane sources, federal rules for the construction and interpretation of those collective bargaining agreements".

We have, in the case before us, a complaint by the Union that the Employer has breached a provision of a collective bargaining agreement. Out of such complaint arise a case and controversy of which the Federal courts have jurisdiction under the Constitution as implemented by Section 301. And see 28 U.S.C.A. § 1337. But it does not follow that because jurisdiction is given to Federal courts, there is a new federal law concept that authorizes the courts to enforce submission to arbitration. Before such a result is reached, we must find a rule of law derived from state or Federal sources. We do not think it matters whether a right to enforce submission to arbitration is or is not substantive, as was considered in Bernhardt v. Polygraphic Company of America, 2 Cir., 1954, 218 F.2d 948; or whether as said by Mr. Justice Brandeis, there is "the substantive right created by an agreement to submit disputes to arbitration", which he said "is recognized as a perfect obligation." Red Cross Line v. Atlantic Fruit Co., 1924, 264 U.S. 109, 44 S.Ct. 274, 277, 68 L.Ed. 582.

■ Finding nothing of Federal origin or in the laws of Alabama, of either common law or statutory enactment, or from any other source, that requires or permits, or from which we might, in the language of Mr. Justice Douglas, fashion a rule requiring or permitting, the enforcement of the covenant for arbitration of grievances, and concluding that Section 301 does not of itself provide or furnish the source for such a rule, we hold that there is no legal right to the relief sought.

In the determination of the case before us, it was held that, since the grievances arose while the collective bargaining agreement was in effect, the Employer was required to arbitrate such grievances subsequent to the termination date of the agreement. Although unwilling to adopt the most recent conclusions of the Third Circuit in construing the United States Arbitration Act, we are impressed by its views with respect to the effect of the termination of a collective bargaining agreement upon Section 301 procedure. After reciting the giving of notice of termination and the failure of negotiations toward a new contract between an employer and a union, the court said:

> "The old contract thereupon terminated pursuant to the permitted election already made manifest by timely notice as provided in the document itself. The obligation not to strike, like the other obligations of the contract ceased to exist. For this reason the complaint was properly dismissed". Paterson Parchment Paper Co. v. International Brotherhood, 3 Cir., 1951, 191 F.2d 252, 254.

Finding as we do that compliance with a covenant for arbitration in a collective bargaining agreement will not be compelled by a Federal court judgment where the courts of the state would deny such relief, it follows that there was no enforceable right which could have been either retained or lost upon the termination of the agreement. Hence we need not and do not decide whether such a covenant would survive where, under the applicable law, such a provision might have been enforced during the term of the agreement.

It is the view of this Court that the District Court erred in not sustaining the defendant's motion to dismiss the action because the complaint fails to state a claim against defendant upon which relief can be granted. Therefore, with a direction to sustain the motion to dismiss, the judgment appealed from is

Reversed.

BROWN, Circuit Judge (dissenting).

The majority declares plainly that the District Court had jurisdiction. It does that on the basis of § 301. With this I am in complete agreement. But applying the rationale of Mr. Justice Frankfurter's opinion as though it was all that was said by a court of eight, § 301 is confined rigorously to the procedural concept. Finding neither state nor federal statute (apart from § 301) authorizing injunctive enforcement of the agreement to arbitrate, the majority concludes that the court with power is yet powerless to proceed—it has power but no tools—in short, the door is opened but the hall is empty. I decline to believe that power is so sterile or that § 301, if needed to bridge any gaps, exhausts itself by opening the door.

On jurisdiction I would spell out what seems implicit in the majority opinion: This is, on all tests, a *union* controversy in which the union is asserting in its collective capacity a demand relating to all of the employees as a group, on the one hand, and the employer, as such on the other. It is not the assertion, through name or guise of the union, of a single claim for one or the aggregation of many single claims for all arising under the individual contracts of employment, as such, between employee and employer. Arbitration, as the last step in the grievance machinery, is in explicit terms the undertaking [1] of union and employer, and by its nature, its force and hence effectiveness, is derived from em-

---

1. Article VIII prescribes the steps. In Step 1 between Room Steward and department Overseer, Step 2 General Shop Committee and Mill Superintendent, the aggrieved employee may, "in his discretion" accompany the union representatives; but in Step 3 between the union and a representative of Employer's executive management and in Step 4 (adopting arbitration under IX(F) ), it is strictly between union and employer.

Article IX(A) states: "The employer and the union agree that the grievance procedures provided herein are adequate

ployer and union pledging that each will be bound. It is, we all agree,[2] therefore a case for § 301.

What law was then to be applied? Side-stepping the engaging prospect of divining the mathematical probabilities of decision on this point amongst Justices splitting on a 3–2–1–2 combination, the court determines that under neither Alabama nor Federal law is there a right to enforce arbitration.

I am willing here to accept this cautious approach and assume that Alabama[3] will not specifically enforce an agreement to arbitrate and that the United States Arbitration Act, 9 U.S. C.A. § 1, is not available[4] or effective to supply the federal statutory mechanics for arbitration.

But the studied search for a federal statute, the painstaking analysis of the cases under it, demonstrates, I think, a misconception of the fundamentals. It is as though we were dealing with a court having statutory power only. But that is not the case. The United States District Court is a constitutional organ with the intrinsic capacity to grant traditional coercive relief as the cause over which it has jurisdiction may require. Williamson v. Berry, 8 How. 495, 536, 12 L.Ed. 1170, 1187, "Jurisdiction in chancery is inherent and original, comprehending now almost every exigency of human disagreement, for which there is not an adequate remedy at law."

Judge Goodrich in the recent opinion in Johnston v. Marsh, 3 Cir., 227 F.2d 528, 530, finding ample inherent power to grant bail even though no statute can be found described both this full power to act once the court acquires jurisdiction [here by virtue of § 301] and the basic misconception that the

---

to provide a fair and final determination of all grievances * * *. It is the desire of the Union and the Employer to avoid strikes and work stoppages." Subparagraphs (B), (C), (D) and (E) contain a precise set of rules for the consequences of strikes, wildcat strikes, slowdowns, and other stoppages in disregard of the agreement to exhaust grievance machinery, including arbitration.

Subparagraph (E) makes it clear that both parties thought this was a § 301 contract as the employer releases the union from liability for damages on the part of the union, its officers, agents or members "for breach of contract of any kind or character whatsoever" in consideration of the union's agreement to make the grievance machinery effectual.

2. Our case International Molders etc. v. Western Foundry Company, No. 15235, decided March 30, 1955 (remanded, per curiam, to dismiss for lack of jurisdiction), certiorari denied, 350 U.S. 886, 76 S.Ct. 139, applied Westinghouse to claim by union for wage increases due employees; Ferguson-Steere Motor Co. v. International Brotherhood, etc., 5 Cir., 223 F.2d 842, held that § 301 could not be used to by-pass the National Labor Relations Board.

3. Alabama may be reluctant as to remedy but not as to general validity. Alabama's constitution and statutes contain provi-

sions indicating a public policy favorable to arbitration in general and spelling out in detail a system and procedure of arbitration. Code of Alabama, Constitution of 1901, Article 4, § 84; Code of Alabama, Title 7, § 829 (formerly 2908) thru § 844 (formerly 2923). § 844 states that the statute is cumulative rather than restrictive, but §§ 829, 830, and 831 may indicate that the statute and public policy are limited to agreements to arbitrate specific disputes already arisen and do not comprehend agreements for arbitration of future disputes. See Headley v. Aetna Insurance Co., 202 Ala. 384, 80 So. 466, 467; Ex parte Birmingham Fire Insurance Co., 233 Ala. 370, 172 So. 99, 101; Caldwell v. Caldwell, 157 Ala. 119, 47 So. 268, 269.

4. See, The Federal Enforcement of Labor Arbitration Agreements, Seymour Phillip Kaye, New York University Sixth Annual Conference on Labor, 1953, p. 207, a detailed discussion of this problem and legislative history of the Arbitration Act; Legal Aspects of Labor Arbitration, Lee Epstein, New York University Second Annual Conference on Labor, 1949, p. 383 at 388; Labor Arbitration—The Arbitrable Issue, Ralph E. Kharas, Fifth Annual Conference on Labor, 1952, pp. 633, 637, 638; Legal Status of Labor Arbitration, Jesse Freidin, New York University First Annual Conference on Labor Law, 1948, 233, 247, 251.

district court can do only that which some statute permits:

"The statement is often made that the inferior courts of the United States are courts of limited jurisdiction. This is a truism in one sense. These courts are competent to act in such cases, and only in such cases, as the Congress, pursuant to the Constitution, assigns to them. And unless constitutional provisions stand in the way, the assignment may be varied at the will of Congress. But within the area of activity assigned to them, Federal courts are courts of full stature, and we may rightly look to common law concepts and precedents to see the scope of the implied or 'inherent' authority which the judicial office carries with it. * * We believe that the basic misconception in those decisions denying

this authority lies in their view that since Federal courts have limited, statutory jurisdiction, their powers in proceedings involving this jurisdiction are necessarily limited and must be statutory. See Principe v. Ault, D.C.N.D.Ohio 1945, 62 F.Supp. 279, 282. This, as already indicated, is not our view of the matter."

The remedy sought here is common and traditional—the equity injunction to compel or restrain action because of the inadequacy of the usual money damage. Its availability need find no source, as such, in specific statute. Indeed, it has been the frequent instrument of effectual sanction for enforcement of the policy of statutes.[5] Since power is present and a traditional tool is available and effective, is there an obstacle to their full use? There is clearly no statutory [6] proscription, and an accurate treatment

5. The equity injunction has been a potent weapon to effectuate declared policy in the field of labor relations against severe attacks that the statute reflecting such policy [here it would be the Taft Hartley Act] was silent on such sanction: Texas & New Orleans Railroad Company v. Brotherhood of Ry. & S. S. Clerks, 281 U.S. 548, 50 S.Ct. 427, 74 L.Ed. 1034; Virginian Ry. Co. v. System Federation No. 40, 300 U.S. 515, 551, 57 S.Ct. 592, 601, 81 L.Ed. 789, 801, "In considering the propriety of the equitable relief granted here, we cannot ignore the judgment of Congress, deliberately expressed in legislation, that where the obstruction of the company union is removed, the meeting of employers and employees at the conference table is a powerful aid to industrial peace." Steele v. Louisville & N. Railroad Co., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173; Tunstal v. Brotherhood of L. F. & E., 323 U.S. 210, 65 S. Ct. 235, 89 L.Ed. 187; Graham v. Brotherhood of L. F. & E., 338 U.S. 232, 70 S.Ct. 14, 94 L.Ed. 22; Brotherhood of Railroad Trainmen v. Howard, 343 U.S. 768, 72 S.Ct. 1022, 96 L.Ed. 1283.

See for other statutes: United States v. Morgan, 307 U.S. 183, 194, 59 S.Ct. 795, 83 L.Ed. 1211, 1218, 1219; Porter v. Warner Holding Company, 328 U.S. 395, 398, 66 S.Ct. 1086, 90 L.Ed. 1332, 1336, 1337; Hecht Co. v. Bowles, 321 U.S. 321, 329, 331, 64 S.Ct. 587, 88 L.Ed. 754, 760, 761; Federal Power Commis-

sion v. Panhandle Eastern Pipe Line Co., 337 U.S. 498, 500, 69 S.Ct. 1251, 93 L. Ed. 1499, 1502. Federal equity court grants or withholds its injunction to effectuate public policy, Hurd v. Hodge, 334 U.S. 24, 34, 35, 68 S.Ct. 847, 92 L. Ed. 1187, 1195.

This power to use a traditional federal equity remedy is so pervasive as to be available in diversity actions where, in a comparable situation, the local state court would not, or could not, grant equitable relief: see Guaranty Trust Co. v. York, 326 U.S. 99, 106, 65 S.Ct. 1464, 89 L.Ed. 2079, 2084, 2085.

Federal equity court has great flexibility in molding relief in cases over which it has jurisdiction with all powers of the Court of Chancery: Sprague v. Ticonic National Bank, 307 U.S. 161, 164, 165, 167, 59 S.Ct. 777, 83 L.Ed. 1184, 1186, 1187; Barber v. Barber, 21 How. 582, 592, 16 L.Ed. 226, 229; it could hardly have this wide capacity were it required to find statutory basis for the remedy, its availability or use.

See also following which affirm an inherent power in a Federal Court to act: Wright v. Henkel, 190 U.S. 40, 63, 23 S. Ct. 781, 47 L.Ed. 948, 956; United States v. Hudson and Goodwin, 7 Cranch 32, 34, 11 U.S. 32, 34, 3 L.Ed. 259, 260; United States v. Shipp, 203 U.S. 563, 572, 573, 27 S.Ct. 165, 51 L.Ed. 319, 323.

6. We are in accord that Norris-LaGuardia Act, 29 U.S.C.A. § 101 et seq., does not

of historical precedent reveals no self-generated decisional policy against its use. Despite the flood of words that ordinarily executory contracts to arbitrate will not be specifically enforced, this reflects no federal policy of hostility to arbitration as such. On the contrary, arbitration is given enthusiastic federal sanction [7] and where a general Congressional policy is plainly indicated that such a mechanism will be useful in effecting its legislative aim, equity has the power, and the right, in the public interest, to make arbitration effective.[8]

Clearly, arbitration is a welcome device to Congress. Indeed, the Arbitration Act itself, 9 U.S.C.A. § 1, reflects a determination that the needs of the business and industrial world would be aided by giving procedural certainty and greater vitality to the use of voluntary non-court means of settling disputes. The express exclusion of "contracts of employment" is no left-handed, reverse reinstatement of the ancient attitude of hostility—"contrary to public policy." Rather, the difficulties encountered by the Third, Fourth and Sixth Circuits in attempting to adapt that statute to the field of labor problems covered so long by special legislation bespeaks, perhaps, a Congressional prescience.

But Congress has been much more direct in its blessing. The Railway Labor Act, 45 U.S.C.A. § 151 et seq., is a detailed framework of voluntary conciliation and mediation with arbitration awards being final, binding and legally

forbid relief here. See also Textile Workers Union v. American Thread Co., D.C. Mass., 113 F.Supp. 137; Local 207 v. Landers, D.C.Conn., 119 F.Supp. 877; Milk and Ice Cream Drivers v. Gillespie Milk Products Corp., 6 Cir., 203 F.2d 650; Textile Workers Union of America v. Aleo Mfg. Co., D.C.N.C., 94 F.Supp. 626; United Textile Workers v. Goodall Sanford, D.C.Me., 131 F.Supp. 767. Contra: Mead v. International Brotherhood, 1 Cir., 217 F.2d 6.

7. The federal approach has not been that of many jurisdictions which, with jealous eye, scanned all such devices lest they infringe upon or oust the courts from their historic role. Judge Hough, in United States Asphalt Refining Co. v. Trinidad Lake Petroleum Co., Ltd., D.C.S.D.N.Y., 222 F. 1006, 1007, characterized it: " * * * A more unworthy genesis cannot be imagined." See Mr. Justice Story's comments from Tobey v. Bristol County, Fed.Cas.No.14,065 quoted footnote 1 Red Cross Line v. Atlantic Fruit Co., 264 U.S. 109, 120, 44 S.Ct. 274, 276, 68 L.Ed. 582, 585, and Mr. Justice Brandeis continued: "But an agreement for arbitration is valid, even if it provides for the determination of liability. If executory, a breach will support an action for damages. Hamilton v. Home Ins. Co., 137 U.S. 370, 385–386, 11 S.Ct. 133, 34 L.Ed. 708, [713] * * * If executed—that is, if the award has been made—effect will be given to the award in any appropriate proceeding at law, or in equity. Karthaus v. Ferrer, 1 Pet. 222, 7 L. Ed. 121; Burchell v. Marsh, 17 How. 344, 15 L.Ed. 96; Bayne v. Morris, 1 Wall. 97, 17 L.Ed. 495. And, although there is no federal legislation on the subject, an executory agreement, however comprehensive, will, if made a rule of court, be enforced in courts of the United States by any appropriate process. Heckers v. Fowler, 2 Wall. 123, 17 L. Ed. 759."

The court in Marine Transit Corp. v. Dreyfus, 284 U.S. 263, 277, 52 S.Ct. 166, 170, 76 L.Ed. 282, 290, sustaining the United States Arbitration Statute characterized compulsion of arbitration as "one of remedy only."

8. Virginian Railway Co. v. System Federation No. 40, supra, 300 U.S. at page 552, 57 S.Ct. at page 601, " * * * The peaceable settlement of labor controversies, * * * is a matter of public concern. * * * Courts of equity may, and frequently do, go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved * * *. The fact that Congress has indicated its purpose to make negotiation obligatory is in itself a declaration of public interest and policy which should be persuasive in inducing courts to give relief. It is for similar reasons that courts, which traditionally have refused to compel performance of a contract to submit to arbitration, Tobey v. Bristol County [C.C., 3 Story 800, Fed.Cas.No. 14,065], supra, enforce statutes commanding performance of arbitration agreements. Red Cross Line v. Atlantic Fruit Co. * * *; Marine Transit Co. v. Dreyfus * * *."

enforceable.[9] This same scheme is duplicated for airline carriers, 45 U.S.C.A. § 181 et seq. Moreover, the Labor Management Relations Act of 1947 contains the positive declaration that it is the policy of the United States that "sound and stable industrial peace and the advancement of the general welfare, health and safety of the Nation * * * can most satisfactorily be secured * *" 29 U.S.C.A. § 171, by settlement of issues between employers and employees by conciliation, mediation, and voluntary arbitration. This is stated, not alone in categorical terms, 29 U.S.C.A. §§ 171 through 178, but the public interest is so direct that the statute establishes the Federal Mediation and Conciliation Service, an independent agency, as an arm of the Government operating at public expense.[10]

In every modern piece of labor legislation, the Congress has either directed the establishment of arbitration systems or has recognized the essential desirability of their existence with the full force of the Government, its prestige, and its treasury behind them as an essential device for maintenance of industrial peace. In such an atmosphere it contradicts all that Congress has done to resurrect the bones of an ancient day to find some supervening notion that arbitration agreements, while tolerated to the point of acceptance once completed, are inherently evil and beneath the claim of right which the Chancellor will affirmatively protect.

The power exists over parties and cause by § 301. The remedy sought is traditional, common and effective. There is no policy against its use and there is overwhelming evidence of a Congressional purpose to encourage, facilitate and make effectual all of the collective processes of bargaining, conciliation, mediation and arbitration. On this approach it is the use of the federal power, a federal remedy to effectuate a federal policy. There is no need to draw upon state jurisprudence with the constitutional uncertainties involved.

Moreover, this gives a cohesive consistency to the total federal labor pic-

9. The Adjustment Boards, § 153, are in reality bipartisan arbitrations whose awards are final, 153, First (m) and enforceable within two years by court petition (p) (q); § 157 provides for arbitration of disputes not settled by mediation or Board of Adjustment under §§ 151–156, and under § 158(l) awards are binding, are filed (k) in the Federal District Court where, under § 159 the award is conclusive and on which the court shall enter judgment unless set aside for one of three limited, specific grounds.

10. Governmental assistance through the Mediation Service is specifically directed to settlement of differences by mutual agreement through conference, collective bargaining, "or by such methods as may be provided for in any applicable agreement for the settlement of disputes" § 171; this is spelled out further in 173(d), "Final adjustment by a method agreed upon by the parties is declared to be the desirable method for settlement of grievance disputes arising over the application or interpretation of an existing collective-bargaining agreement. The Service is directed to make its conciliation and mediation services available in the settlement of such grievance disputes only as a last resort and in exceptional cases."

See, Legal Aspects of Labor Arbitration, Epstein at p. 389, cited footnote 4, supra.

Forkosch, Treatise on Labor Law, 1953, 476–488, in a detailed analysis suggests that the policy on arbitration is so strong that it might even be compulsory, at least in satisfying the conditions precedent to a Norris-LaGuardia injunction. This is certainly the plain holding of Brotherhood of Railway Trainmen v. Toledo, Peoria & Western Railroad, 321 U.S. 50, 64 S.Ct. 413, 88 L.Ed. 534, and its rejection of the holding of this Court, Mayo v. Dean, 5 Cir., 82 F.2d 554 (see Supreme Court discussion at 321 U.S. 61, 64 S.Ct. 419, 88 L.Ed. 541). The words of § 108, 29 U.S.C.A. § 108, are categorical that it is the policy of Congress that, "every reasonable effort to settle such dispute either by negotiation or with the aid of any available governmental machinery of mediation or *voluntary arbitration*" shall be made. Inscribed so plainly and announced for such a length of time (since 1932), it seems unlikely to think that Congress must spell it out again.

See United Office and Professional Workers of America v. Monumental Life

ture. Federal constitutional power is amply present under this very Labor Management Relations Act to require employer and employees to bargain in good faith on the inclusion [11] of an agreement to arbitrate in the bargaining contract and to issue necessary coercive orders to effectuate it, to protect parties from charges of unfair labor practice [12] and deny reinstatement [13] to displace strikers where the strike is a breach of the agreement to arbitrate.

Arbitration is now the usual, almost universal mechanism to assure industrial peace during the life of the contract. Unlike its frequent use in commercial fields as a substitute for the costly delays and uncertainties of court litigation, the device is adopted in labor relations as a substitute for the economic pressures each can marshal in the strike or lockout, or the threat of either.[14] It would be incongruous indeed to find difficulty or even doubt, that a

Ins. Co., D.C.E.D.Pa., 88 F.Supp. 602, 607.

11. 29 U.S.C.A. § 158(a) (5). In N.L.R.B. v. Corsicana Cotton Mills, 5 Cir., 179 F.2d 234, 235, a contempt proceeding for violation of cease and desist order, we exerted a supervisory administration of the collective bargaining process, one of the points in controversy being the arbitration clause. See N.L.R.B. v. American National Insurance Co., 343 U.S. 395, 407, 408, 72 S.Ct. 824, 831, 96 L.Ed. 1027, 1038, 1039, requiring, but finding, good faith negotiation on the issue of a "management functions clause" versus "unlimited arbitration clause."

12. See Timken Roller Bearing Co. v. N.L.R.B., 6 Cir., 161 F.2d 949. Without invoking grievance machinery including arbitration for layoff of ten employees, union struck, employer refused further to entertain grievances and Board found employer guilty of unfair labor practice for failure to bargain; the court reverses holding that to require compliance with the contract including the agreement to submit to arbitration is the essence of collective bargaining in good faith; likewise, it held the union strike over a demand against subcontracting unlawful since the question whether subcontracting was or was not within the "management functions clause" was itself an arbitrable issue.

See also, N.L.R.B. v. Standard Oil Co., 6 Cir., 196 F.2d 892.

13. W. L. Mead, Inc., 113 L.R.B. 109, 5 C. C.H. Labor Law Reports (4th Edition), par. 53162, Labor Law Journal, October 1955, Vol. 6, No. 10, p. 721; 20 employees walked off job, established a picket line to enforce demands concerning definition of duties and working hours of a truck driver after employer requested arbitration pursuant to arbitration clause in bargaining agreement. General Counsel brought complaint for refusal to rehire; Board reversed Trial

Examiner and held employer could lawfully discharge the strikers. The Board stated: " * * * There can be no question but that in the case before us the grievance and arbitration clause * * * is a material provision of that agreement. * * *. We find that [the contract] * * * excluded any other means but arbitration for the resolution of disputes, particularly unilateral action by any party * * *.

"Every encouragement should be given to the making and enforcement of such clauses. * * * To hold that a strike in furtherance of such a material breach of a clear and binding contractual arbitration clause is to be protected by this Board would be contrary to the labor policy embodied in the National Labor Relations Act as interpreted by the Courts of Appeals and the Supreme Court."

14. As perhaps unique proof of its unpartisanship arbitration has the rare distinction of being praised and feared by management and labor alike. Peter Seitz, a management representative, in The Enforcement of Collective Bargaining Contracts By Arbitration, New York University Sixth Annual Conference on Labor, 1953, p. 15, describes it: "The first fact to note is that arbitration is what I call a 'glandular' word. By that I mean that the mere articulation of the word causes thyroid and adrenal glands to secrete. Mention the term and calm men get bloodshot eyes; pulses throb and temperatures rise. This is specially interesting because the identical, violent, physical and emotional reactions will be observed in both management and labor representatives * * * [the] attitude toward arbitration is not unlike that of George Wither, the Restoration poet, who impatient with the conspicuous lack of affection demonstrated by his lady-love proclaimed:

" 'If she be not so to me,
What care I how fair she be?' "

The widespread use commenced during

sovereign which can constitutionally compel the parties seriously in good faith to negotiate for an agreement to arbitrate, and punish and coerce them into compliance with it by administrative orders, sanctions or the denial of them with the added prestige of court approval by appellate review, will lack the power when its constitutional court is asked to grant a traditional remedy which will have the same end.

If I am mistaken that the network of federal labor legislation is the culture in which the Congressional policy of encouraging effective enforcement of arbitration can grow into a basis for an equity court granting an injunction, I would nonetheless reach the same result by using, for the first time, § 301 in a modified substantive way. I do this since I believe that § 301 is much more than a mere photoelectric cell to open wide the door as union-employer, *vis-a-vis*, approach. When a genuine *union* controversy, i. e., a 301 suit comes before it, the combinations of dissenting and concurring opinions in Westing-

house will, I believe, restore sufficient vitality to § 301 to enable it to reflect federal policy itself and reach out comfortably, as the occasion may require, into state and federal concepts to fashion the controlling law. Whether this will be the creation of new federal rights or merely the release of is nascent powers, this reading of § 301 would say to the district court that if there has been a breach of the collective bargaining agreement it shall exert whatever of its traditional weapons—the money judgment, the declaratory pronouncement, or the equity injunction—which will best assure contractual compliance.

Difficulties in forging a responsive jurisprudence neither indicate nor foretell a constitutional void, and it seems surprising at this late date that our flexible judicial apparatus, because of the likelihood of conflict with local law, should shrink from the necessity. The federal system has so well demonstrated its fluid capacity [15] that, applying its rule, doctrines frequently ignore, often reject, and frequently collide with local

the war days under the National War Labor Board and was stimulated later by the President's National Labor-Management Conference of 1945 attended by delegates representing AFL, CIO, Mine Workers, Railway Brotherhoods, United States Chamber of Commerce, National Association of Manufacturers which recommended final determination of grievances involving the interpretation or application of the collective bargaining agreement by an impartial chairman, arbitrator, or board, the decision of which should be final and binding on both, with specific machinery agreed to on the selection of the arbitrator (the agreement in this case tracks it closely). U. S. Department of Labor, Division of Labor Standards Bulletin No. 77, pp. 42, 43, 1946. A study made by the Bureau of National Affairs, Inc., 1950, indicated that at least 80% of the collective bargaining agreements in the nation's important industries provided for arbitration as the terminal point of the grievance machinery. See, How Arbitration Works, Elkourie, 1952, The Bureau of National Affairs, Inc., pp. 6–10; Arbitration and Arbitration Provisions, J. Noble Braden, Tribunal Vice-President, American Arbitration Association, New York University, Second Annual Con-

ference on Labor, 1949, 355, 365. There has been a steady growth in percentage of agreements to arbitrate, from 73% in 1944 to 83% in 1949, Arbitration Provisions in Union Agreements in 1949, James Nix, Monthly Labor Review, February 1950, pp. 160–165, to approximately 91% in 1942, Arbitration Provisions in Collective Agreements, 1952, Ernestene M. Moore and James Nix, Monthly Labor Review, U. S. Department of Labor, Bureau of Labor Statistics, March 1953, pp. 261–266. The value of arbitration in the workaday handling of labor relations is attested by the practice of making formal, written arbitration reports which are indexed, digested and reported. See, Labor Arbitration Reports, The Bureau of National Affairs, Inc., approximately 21 volumes published.

15. The federal courts have fashioned suitable federal principles in countless situations to effectuate multiple federal policies: Tort rules under Federal Employers Liability Act, Jesionowski v. Boston & M. R. R., 329 U.S. 452, 67 S.Ct. 401, 91 L.Ed. 416, Central Vermont Ry. Co. v. White, 238 U.S. 507, 35 S.Ct. 865, 59 L.Ed. 1433; The Jones Act, 46 U.S.C. 688, Socony-Vacuum Oil Co. v. Smith, 305 U.S. 424, 59 S.Ct. 262, 83 L.

(state) principles [16] and, where needed to effectuate Congressional will, the conflict and collision [17] may occur between two federal statutes or policies.

The agreement to arbitrate, for employer and employees alike, goes to the very heart of the collective contract. The native forces of competing economic pressures are held in leash by it. Repudiation by either is a challenge which

§ 301 sought to answer. If it is not available here, then nought [18] is left of § 301 but the right to sue for money damages. Had that been the narrow hope of Congress, just such simple words would have been used.

The injunctive order to compel arbitration was right and should be affirmed.

I therefore respectfully dissent.

Ed. 265; Laches in the enforcement of federal rights, Holmberg v. Armbrecht, 327 U.S. 392, 66 S.Ct. 582, 90 L.Ed. 743; Government contracts, Priebe & Sons v. United States, 332 U.S. 407, 68 S.Ct. 123, 92 L.Ed. 32, Federal Crop Ins. Corp. v. Merrill, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10; Federal negotiable instruments and bonds, Clearfield Trust Co. v. United States, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838, National Metropolitan Bank v. United States, 323 U.S. 454, 65 S.Ct. 354, 89 L.Ed. 383, Continental American Bank & Trust Co. v. United States, 5 Cir., 161 F.2d 935, D'Oench, Duhme & Co. v. Federal Deposit Insurance Corp., 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956; Problems incident to National Banking System, Deitrick v. Greaney, 309 U.S. 190, 60 S.Ct. 480, 84 L.Ed. 694; Liabilities in performance interstate transportation contracts, O'Brien v. Western Union Telegraph Co., 1 Cir., 113 F.2d 539; and see Moore's Commentary on the United States Judicial Code, 1949, pp. 340–359, revealing, in detail, the development of a full body of law adequate to give life to federal policy.

16. Spectacular illustrations are found in the field of federal taxation: Burnet v. Harmel, 287 U.S. 103, 53 S.Ct. 74, 77 L.Ed. 199, property status oil lease under local (Texas) law rejected; Burk-Waggoner Oil Association v. Hopkins, 269 U.S. 110, 111, 114, 46 S.Ct. 48, 70 L.Ed. 183, 185, state law disregarded in determining status of group as partnership or corporation for income tax purposes; Lyeth v. Hoey, 305 U.S. 188, 59 S.Ct. 155, 83 L.Ed. 119, nature of interest under inheritance.

Similarly, state standards on existence of independent contractor relationship and the common law concept of direction and control, are frequently rejected: Rutherford Food Corp. v. McComb, 331 U.S. 722, 67 S.Ct. 1473, 91 L.Ed. 1772; United States v. Silk (Harrison v. Greyvan Lines), 331 U.S. 704, 715, 719, 67 S.Ct. 1463, 1469, 1471, 91 L.Ed. 1757;

N.L.R.B. v. Hearst, 322 U.S. 111, 124–133, 64 S.Ct. 851, 88 L.Ed. 1170.

17. The same situation or circumstance frequently produces diverse results: e. g., direction and control of trucks, adequate to create genuine independent contractor relationship under Wage & Hour Law, 29 U.S.C.A. § 151 et seq., and Social Security Law, 42 U.S.C.A. §§ 1001 et seq. 1101 et seq., United States v. Silk (Harrison v. Greyvan Lines), 331 U.S. 704, 67 S.Ct. 1463, 91 L.Ed. 1757, is insufficient to make physical performance by owner-drivers of trucks "transportation" under National Transportation Act, 49 U.S.C.A. § 301 et seq., United States v. N. E. Rosenblum Truck Lines, 315 U.S. 50, 62 S.Ct. 445, 86 L.Ed. 671, Thomson v. United States, 321 U.S. 19, 64 S.Ct. 392, 88 L.Ed. 513; a crew member of a non-self-propelled dredge is a "seaman" under the Jones Act, 46 U.S.C.A. § 688, McKie v. Diamond Marine Co., 5 Cir., 204 F.2d 132, but not a "seaman" under the Wage & Hour Act, 29 U.S.C.A. § 201 et seq.; Walling v. W. D. Haden Co., 5 Cir., 153 F.2d 196, certiorari denied 328 U.S. 866, 66 S.Ct. 1373, 90 L.Ed. 1636; Towing of barges physically performed by chartered tug is not "transportation" by tug owner-operator under the Interstate Commerce Act, 49 U.S.C.A. §§ 901, 909(a), De Bardeleben Coal Corp. v. United States, D.C.W.D.Pa., 54 F.Supp. 643, affirming Union Barge Line Application, 250 I.C.C. 689, but is "transportation" for transportation tax under 26 U.S.C. § 3475(a), Gulf Coast Towing Co. v. United States, 5 Cir., 196 F.2d 944.

18. The court's action in International Ladies' Garment Workers, etc. v. Jay-Ann Co., 5 Cir., 228 F.2d 632, with this one, chipping away from § 301, adds only to the uncertainty. The court finds no jurisdiction to enforce the agreement to make payments by employer to the union's welfare fund. I would disagree with it as well. That, too, seems to me to be a genuine union controversy, and finding no jurisdiction it is actually in conflict with the majority here.